# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

Juan Manuel Lopez-Campos, et al.,

*Petitioners-Appellees*,

v.

Kevin Raycraft, et al.,

*Respondents-Appellants*.

On Appeal from the U.S. District Courts for the Eastern District of Michigan, No. 2:25-cv-12486-BRM; the Western District of Michigan, No. 1:25-cv-1090-JMB; and the Eastern District of Michigan, Nos. 2:25-cv-13073-BRM, 2:25-cv-12546-RJW

## CONSENTED TO BRIEF OF *AMICI CURIAE* AMERICAN IMMIGRATION COUNCIL AND AMERICAN IMMGRATION LAWYERS ASSOCIATION IN SUPPORT OF PETITIONERS-APPELLEES AND AFFIRMANCE

Suchita Mathur*
Rebecca Cassler*
Emma Winger*
American Immigration Council
PMB 2026
2001 L St. NW Suite 500
Washington, DC 20036
Tel: (202) 507-7537
smathur@immcouncil.org
rcassler@immcouncil.org
ewinger@immcouncil.org

*Attorneys for Amici Curiae*

*Not admitted to the Sixth Circuit Bar

**CORPORATE DISCLOSURE STATEMENT UNDER 6 CIR. R. 26.1(a)**

Pursuant to 6 Cir. R. 26(a)(1), which applies Fed. R. App. P. 26.1 to all amici curiae in a civil case, I certify that the American Immigration Lawyers Association and the American Immigration Council are non-profit organizations that do not have any parent corporations or issue stock and, consequently, there exists no publicly held corporation which owns 10% or more of stock.

Dated: January 12, 2026          */s/ Suchita Mathur*
                                            Suchita Mathur

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................. iii

INTEREST OF AMICI CURIAE ........................................................... 1

I.  INTRODUCTION ............................................................................ 2

II. ARGUMENT ................................................................................... 3

   A. The Government's Unlawful Mandatory Detention Policy Facilitates its Mass Deportation Campaign. ............................................................... 3

      1. The Administration Changes Long-Settled Interpretation of Detention Statutes, Radically Expanding Mandatory Detention. ....................... 4

      2. Courts Overwhelmingly Reject the New Interpretation, Yet Most Noncitizens Are Unable to Challenge their Unlawful Detention ...................... 6

   B. The Administration's New Policy Targets Noncitizens Whose Mandatory Detention Serves No Purpose. ............................................... 8

      1. Long-Term Residents .............................................................. 10

      2. People with Ongoing Immigration Processes ............................. 12

      3. Survivors of Abuse, Violence, and Trafficking ........................... 15

      4. Young Adults with Special Statutory Protections ....................... 17

   C. The Impact of the New Detention Policy Underscores its Arbitrariness. .......... 19

      1. Abusive Detention ................................................................. 19

      2. Coercion to Abandon Rights .................................................. 24

III. CONCLUSION .............................................................................. 28

CERTIFICATE OF COMPLIANCE ................................................... 30

CERTIFICATE OF CONSENT ......................................................... 31

CERTIFICATE OF SERVICE ........................................................... 32

# TABLE OF AUTHORITIES

**CASES**                                                         **Page(s)**

*A.C.R. v. Noem*, 2025 WL 3228840 (E.D.N.Y. Nov. 19, 2025)...............................18

*Alva v. Noem*, 2025 WL 3281211 (E.D. Cal. Nov. 25, 2025) .......................... 12, 22

*Alvarez Ortiz v. Freden*, 2025 WL 3085032 (W.D.N.Y. Nov. 4, 2025) ................17

*Arce v. Trump*, 2025 WL 2675934 (D. Neb. Sept. 18, 2025)...................................12

*Arostegui-Maldonado v. Baltazar*, 794 F. Supp. 3d 926 (D. Colo. 2025) ................5

*Ballestros v. Noem*, 2025 WL 2880831 (W.D. Ky. Oct. 9, 2025)..........................16

*Belsai D.S. v. Bondi*, 2025 WL 2802947 (D. Minn. Oct. 1, 2025).........................14

*Bethancourt Soto v. Soto*, 2025 WL 2976572 (D.N.J. Oct. 22, 2025) .....................9

*Campos-Flores v. Bondi*, 2025 WL 3461551 (E.D. Va. Dec. 2, 2025)...................18

*Carlos v. Noem*, 2025 WL 2896156 (D. Nev. Oct. 10, 2025)...................................7

*Castillo v. Andra-Ybarra*, 2025 WL 3251223 (D.N.M. Nov. 21, 2025).................10

*Contreras-Cervantes v. Raycraft*, 2025 WL 2952796 (E.D. Mich. Oct. 17, 2025) ..8

*Cortez-Gonzalez v. Noem*, 2025 WL 3485771 (D.N.M. Dec. 4, 2025)...................17

*D.N.N. v. Bacon*, No. 25-cv-01613-JRR (D. Md. June 30, 2025) ............................5

*De Leon Hernandez v. Bondi*, 2025 WL 3217037 (W.D. La. Nov. 18, 2025)........18

*Del Cid v. Bondi*, 2025 WL 2985150 (W.D. Pa. Oct. 23, 2025) ............................18

*Diallo v. Joyce*, 2025 WL 3718477 (S.D.N.Y. Dec. 23, 2025) .................................6

*Diaz Diaz v. Mattivelo*, 2025 WL 2457610 (D. Mass. Aug. 27, 2025)..................13

*Escobar Molina*, No. 25-cv-3417, ECF 17-16 (D.D.C. filed Oct. 3, 2025) .............4

*Escobar Salgado v. Mattos*, 2025 WL 3205356 (D. Nev. Nov. 17, 2025).............11

*Espinoza v. Kaiser*, 2025 WL 2675785 (E.D. Cal. Sept. 18, 2025) ................ 23, 24

*Estrada-Samayoa v. Cruz*, 2025 WL 3268280 (E.D. Cal. Nov. 24, 2025) .........9, 13

*F.S.S.M. v. Wofford*, 2025 WL 3526671 (E.D. Cal. Dec. 9, 2025) ........................19

*G.Z.T. v. Smith*, No. 1:25-cv-12802, ECF 14 (N.D. Ill. Oct. 21, 2025) ..................23

*Gamez Lira v. Noem*, 2025 WL 2581710 (D.N.M. Sept. 5, 2025)..........................14

iii

*Gonzalez v. Noem*, 2025 WL 3204602 (N.D. Ill. Nov. 17, 2025)........................7, 25

*Guerrero v. Noem*, 2025 WL 3520407 (W.D. Mich. Dec. 9, 2025).......................14

*Helbrum v. Williams Olson*, 2025 WL 2840273 (S.D. Iowa Sept. 30, 2025)...........9

*J.U. v. Maldonado*, 2025 WL 2772765 (E.D.N.Y. Sept. 29, 2025) .......................12

*Jennings v. Rodriguez*, 583 U.S. 281 (2018) ...............................................5

*Kashranov v. Jamison*, 2025 WL 3188399 (E.D. Pa. Nov. 14, 2025) ...................16

*Lepe v. Andrews*, 2025 WL 2716910 (E.D. Cal. Sept. 23, 2025)..........................22

*Lomeu v. Soto*, 2025 WL 2981296 (D.N.J. Oct. 23, 2025)....................................22

*Lopez-Arevelo v. Ripa*, 2025 WL 2691828 (W.D. Tex. Sept. 22, 2025)................17

*Maldonado Vazquez v. Feeley*, 2025 WL 2676082 (D. Nev. Sept. 17, 2025)...........4

*Martinez v. Larose*, 968 F.3d 555 (6th Cir. 2020) ......................................5

*Martinez v. Noem*, 2025 WL 2965859 (W.D. Tex. Oct. 21, 2025) ........................10

*Mata Fuentes v. Olson*, 2025 WL 3524455 (D. Minn. Dec. 9, 2025)..............11, 17

*Matter Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025)........................................6, 22

*Mercado v. Francis*, 2025 WL 3295903 (S.D.N.Y. Nov. 26, 2025) ...................6, 21

*Merino v. Ripa*, 2025 WL 2941609 (S.D. Fla. Oct. 15, 2025) .................. 13, 18, 21

*Munoz Materano v. Arteta*, 2025 WL 2630826 (S.D.N.Y. Sept. 12, 2025)..............7

*Ndiaye v. Jamison*, 2025 WL 3229307 (E.D. Pa. Nov. 19, 2025)..........................16

*Pacheco Mayen v. Raycraft*, 2025 WL 2978529 (E.D. Mich. Oct. 17, 2025) .........9

*Patel v. Hardin*, 2025 WL 3442706 (M.D. Fla. Dec. 1, 2025)...............................17

*Quispe v. Crawford*, 2025 WL 2783799 (E.D. Va. Sept. 29, 2025)................ 10, 22

*Quispe-Ardiles v. Noem*, 2025 WL 2783800 (E.D. Va. Sept. 30, 2025)................16

*Rocano Buestan v. McShane*, 2025 WL 3496361 (S.D.N.Y. Dec. 5, 2025) ............8

*Rodriguez v Knight*, 2025 WL 3228285 (D. Idaho Nov. 19, 2025) ........................8

*Rodriguez v. Bostock*, 2025 WL 2782499 (W.D. Wash. 2025) ...............................5

*Rodriguez v. Kaiser*, 2025 WL 2855193 (E.D. Cal. Oct. 8, 2025)........................24

*Rojano Gonzalez v. Sterling*, 2025 WL 3145764 (N.D. Ga. Nov. 3, 2025)............13

*Romero v. Francis*, 2025 WL 3110459 (S.D.N.Y. Nov. 6, 2025)...........................10

*Romero v. Hyde*, 795 F. Supp. 3d 271 (D. Mass. 2025) ...........................................21

*Sanchez v. Olson*, 2025 WL 3004580 (N.D. Ill. Oct. 27, 2025) .............................11

*Sandoval v. Rokosky*, 2025 WL 3204746 (D.N.J. Nov. 17, 2025) ..........................19

*Santiago v. Noem*, 2025 WL 2792588 (W.D. Tex. Oct. 2, 2025) ...........................14

*Sepulveda Ayala v. Bondi*, 794 F. Supp. 3d 901 (W.D Wash. 2025) .....................15

*United States v. Estrada-Mederos*, 784 F.3d 1086 (7th Cir. 2015) .........................20

*Valerio v. Joyce*, 2025 WL 3251445 (D.N.J. Nov. 21, 2025) ................................10

*Velasco Lopez v. Decker*, 978 F.3d 842 (2d Cir. 2020) .........................................20

*Y.Z. v. Soto*, 2025 WL 3564652 (D.N.J. Dec. 12, 2025) ......................................27

*Yupangui v. Hale*, 2025 WL 3207070 (D. Vt. Nov. 17, 2025) ........................ 16, 22

*Zadvydas v. Davis*, 533 U.S. 678 (2001) ..............................................................8

## STATUTES

8 U.S.C. §1101(a)(15)(T) ......................................................................................15

8 U.S.C. §1101(a)(15)(U) ......................................................................................15

8 U.S.C. §1101(a)(27)(J) ........................................................................................18

8 U.S.C. §1101(a)(51) ............................................................................................15

8 U.S.C. §1154(a)(1)(A)(iii) ..................................................................................15

8 U.S.C. §1154(a)(1)(B)(iii) ..................................................................................15

8 U.S.C. §1154(a)(1)(D)(i)(II) ...............................................................................15

8 U.S.C. §1154(a)(1)(D)(i)(IV) ..............................................................................15

8 U.S.C. §1158 ......................................................................................................15

8 U.S.C. §1158(b)(3)(C) ........................................................................................18

8 U.S.C. §1158(d)(2) .............................................................................................15

8 U.S.C. §1182(d)(5) ...........................................................................................5, 9

8 U.S.C. §1225(b) ........................................................................................ 5, 6, 8, 9

8 U.S.C. §1225(b)(2) ....................................................................................... *passim*

8 U.S.C. §1226 .................................................................................................5, 9

8 U.S.C. §1226(a) ...................................................4

8 U.S.C. §1226(a)(2) ...............................................5

8 U.S.C. §1226(c) ...................................................9

8 U.S.C. §1226(c)(1)(E) ..........................................9

8 U.S.C. §1229a(b)(4)(A) .......................................7

8 U.S.C. §1229b(b)(1) ...........................................12

8 U.S.C. §1232(b)(1) .............................................18

8 U.S.C. §1232(c)(2)(B) .........................................18

22 U.S.C. §7105(c)(3) ...........................................15

Laken Riley Act, Pub. L. 119-1, 139 Stat. 3 (2025) ...................................................9

## REGULATIONS

8 C.F.R. §204.2(c)(6)(i) .........................................15

8 C.F.R. §204.2(e)(6)(i) .........................................15

8 C.F.R. §214.14(d)(2) ..........................................15

8 C.F.R. §214.205(c) .............................................15

8 C.F.R. §236.1(d)(1) .............................................5

8 C.F.R. §236.21(c)(1) ..........................................14

8 C.F.R. §236.21(c)(3) ..........................................14

8 C.F.R. §236.23(d)(1) ..........................................14

8 C.F.R. §1236.1(d)(1) ...........................................5

## OTHER AUTHORITIES

Albert Sun, *Most Immigrants Arrested in City Crackdowns Have No Criminal Record*, N.Y. Times (Dec. 4, 2025), https://tinyurl.com/4c7bd2jx .........................9

Casey Tolan & Isabelle Chapman, *Immigrants spend days in 'miserable' ICE hold rooms, violating longstanding policy*, CNN (Sept. 8, 2025), https://tinyurl.com/hmchsr86 ...............................................20

Congressional Research Service, *Understanding the FY2026 DHS Budget Request*, Sept. 5, 2025, at 6, https://www.congress.gov/crs-product/R48704#ifn12 ............4

David J. Bier, *5% of People Detained by ICE Have Violent Convictions, 73% No Convictions*, CATO Institute (Nov. 24, 2025), https://tinyurl.com/2sy9cu2b ........9

Decl. of Darwin Lopez Castañon, *Escobar Molina*, No. 25-cv-3417, ECF 17-16 (D.D.C. filed Oct. 3, 2025) ...................................................................25

Decl. of Fredy Cazarez Gonzalez, *Gonzalez v. Noem*, No. 25-13323, ECF 2-40 (N.D. Ill. filed Oct. 30, 2025) .............................................................24

Decl. of Hugo Sanchez Trillos, *Mercado v. Noem*, No. 25-cv-6568, ECF 27 (S.D.N.Y. filed Aug. 8, 2025).............................................................25

Decl. of Jack Doe, *Gonzalez v. Noem*, No. 1:25-cv-13323, ECF 2-38 (N.D. Ill. filed Oct. 30, 2025) ............................................................................26

Decl. of Julio Armenta, *Ruiz v. ICE*, No. 25-cv-9757, ECF 22-33 (N.D. Cal. filed Dec. 1, 2025)..............................................................................25

ICE, *Detention Facilities,* https://www.ice.gov/detention-facilities (June 25, 2025) ...........................................................................................19

ICE, FY 2026 ICE Statistics, https://tinyurl.com/3zdmpdm9 ..................................3

Ingrid Eagly & Steven Shafer, *Yes, Immigrants Have the Right to a Lawyer, but Finding One Is Getting Harder*, L.A. Times (Nov. 26, 2025), https://tinyurl.com/3fvnwess ........................................................................7

Ingrid V. Eagly et al., *Access to Counsel in Immigration Court, Revisited*, 111 Iowa L. Rev. 1, 26 (2025), https://ssrn.com/abstract=5744804......................................7

José Olivares, *Gutting of Key US Watchdog Could Pave Way for Grave Immigration Abuses, Experts Warn*, The Guardian (Nov. 30, 2025), https://tinyurl.com/ycxax35w ...............................................................20

Kyle Cheney, *Hundreds of Judges Reject Trump's Mandatory Detention Policy, With No End in Sight*, Politico (Jan. 5, 2026), https://tinyurl.com/bdprvb68.........6

Letter from ACLU et al., on Coercive Third Country Deportations and Abusive Conditions of Confinement in Immigration Detention at Fort Bliss, TX to Todd Lyons, ICE Director, et al. (Dec. 8, 2025), https://tinyurl.com/52amp87z ..........20

Maanvi Singh et al., *2025 was ICE's deadliest year in two decades. Here are the 32 people who died in custody*, The Guardian (Jan. 4, 2026), https://tinyurl.com/4j86j89f .................................................................. 22

Mel Leonor Barclay & Shefali Luthra, *A Cicero Woman's Baby Was in the NICU. She Was In ICE Detention.* Chi. Sun-Times (Dec. 8, 2025), https://tinyurl.com/mrx5t7d3 ................................................................ 23

Memo from Todd Lyons to All ICE Employees, "Interim Guidance," July 8, 2025, available at https://tinyurl.com/2syf8r54 ............................................ 6

Miriam Jordan & Jazmine Ulloa, *Concerns Grow Over Dire Conditions in Immigrant Detention*, N.Y. Times (July 1, 2025), https://tinyurl.com/msyv8mdz .................................................................................................... 20

Morgan Lee & Stephen Groves, *Immigrant detention beds may be maxed out as Trump moves to deport 'millions and millions'*, AP (Jan. 24, 2025), https://tinyurl.com/y4wxbjze ................................................................. 4

Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents*, ProPublica (Oct. 16, 2025), https://tinyurl.com/3emhk83z .. 4

Press Release, The White House, Promises Made, Promises Kept: Border Security Achieved in Fewer Than 100 Days (Apr. 28, 2025), https://tinyurl.com/2kydj9pu .................................................................................................... 3

Rachel Uranga, *Pregnant Immigrants Held for Months in Detention Despite Rules Against It*, L.A. Times (Dec. 3, 2025), https://tinyurl.com/2mkhm8y8 .............. 23

Sen. John Ossoff, Medical Neglect & Denial of Adequate Food or Water in U.S. Immigration Detention (Oct. 2025), https://tinyurl.com/mpvtvzmk. .................. 21

TRACImmigration, *ICE Contractual Capacity and Number Detained: Overcapacity vs. Overcrowding* (July 8, 2025), https://tinyurl.com/78dpbumx .. 20

Vera Institute for Just., *ICE Detention Trends*, https://tinyurl.com/449c886u ......... 3

Vera Institute for Just., *More People Are in Immigration Detention Than Ever Before* (Oct. 2, 2025), https://tinyurl.com/sf29ev5j ............................................ 19

# INTEREST OF AMICI CURIAE

The American Immigration Council (Council) is a non-profit organization that strives to strengthen the United States by shaping immigration policies and practices through innovative programs, cutting-edge research, and strategic legal and advocacy efforts grounded in evidence, compassion, justice and fairness. The Council regularly litigates and advocates around issues involving immigration detention and appears as amicus curiae before the U.S. Courts of Appeals and the Supreme Court.

The American Immigration Lawyers Association (AILA), founded in 1946, is a national, non-partisan, non-profit association with more than 18,000 members throughout the United States and abroad, including lawyers and law school professors who practice and teach in the field of immigration and nationality law. AILA seeks to promote justice, advocate for fair and reasonable immigration law and policy, and advance the quality of immigration and nationality law and practice. AILA's members practice regularly before the Department of Homeland Security, immigration courts and the Board of Immigration Appeals, as well as before the U.S. Courts of Appeals and the Supreme Court.[1]

---

[1] No party's counsel authored this brief in whole or in part, nor contributed money intended to fund preparing or submitting this brief. No person other than *amici* or their counsel contributed money intended to fund preparing or submitting this brief. Fed. R. App. P. 29(a)(4)(E).

# I. INTRODUCTION

At issue in this appeal is the government's sudden about-face on the meaning of two detention statutes, resulting in a radical expansion of mandatory immigration detention. Rejecting three decades of agency and judicial interpretation, the government now maintains that 8 U.S.C. §1225(b)(2) requires the no-bond detention of each of the millions of noncitizens present in the United States without admission. Amici agree with Appellees that this novel interpretation is plainly incorrect.

Amici write separately to show how the government is using its new policy: not to hold those who present a danger or are likely to flee—the only permissible purposes of civil detention—but instead to arbitrarily detain as many people as possible, regardless of the costs. To date, the government has likely subjected tens of thousands of people to mandatory detention—many of whom have deep ties to this country, special vulnerabilities, viable pathways to immigration status, and a history of compliance with previously-imposed conditions of release. This has allowed this administration to achieve its mass deportation goals in particularly cruel ways. Noncitizens newly subject to this policy face a painful choice: remain imprisoned in increasingly inhumane conditions with no individualized review whatsoever, or relinquish any chance to vindicate their statutory rights to seek

relief from removal. This is not what Congress intended. Amici urge the Court to affirm the judgments below.

## II. ARGUMENT

### A. The Government's Unlawful Mandatory Detention Policy Facilitates its Mass Deportation Campaign.

In 2025, the Department of Homeland Security (DHS) launched what the President promised would be "the largest deportation operation in the history of our country."[2] As a central component of this campaign, DHS—through its constituent agencies Immigration and Customs Enforcement (ICE) and Customs and Border Protection (CBP)—has dramatically expanded civil immigration arrests and indiscriminate immigration detention. The results are striking. As of January 8, 2026, DHS was detaining a daily average of nearly 70,000 people, the highest level ever publicly reported—over 15,000 more than the previous record under the first Trump administration[3]—and at tremendous cost to American taxpayers.[4]

---

[2] Press Release, The White House, *Promises Made, Promises Kept: Border Security Achieved in Fewer Than 100 Days* (Apr. 28, 2025), https://tinyurl.com/2kydj9pu.

[3] ICE, *FY 2026 ICE Statistics*, https://tinyurl.com/3zdmpdm9 (last updated Jan. 8, 2026) (select "Detention FY26" tab); Vera Institute For Just., *ICE Detention Trends*, https://tinyurl.com/449c886u (last updated Dec. 18, 2025).

[4] The bill to the public is unfathomably large: immigration detention at today's levels costs nearly $11.4 million *per day*, and the government has allocated $45 *billion* to immigration detention for the next three years, many times more than has ever been spent on keeping noncitizens in custody. *See* ICE, *FY 2026 ICE Statistics* (December 2025 average daily population in ICE custody 68,908); Morgan Lee & Stephen Groves, *Immigrant detention beds may be maxed out as Trump moves to deport 'millions and millions'*, AP (Jan. 24, 2025),

1. **The Administration Changes Long-Settled Interpretation of Detention Statutes, Radically Expanding Mandatory Detention.**

The administration has employed a range of tactics, many of which are unlawful, in service of its "mass deportation" goal.[5] Most notably, DHS and the Department of Justice (DOJ) have dramatically expanded mandatory detention by reversing longstanding agency interpretations about who is entitled to bond hearings while in civil immigration proceedings. This change has staggering implications. "The challenged policy subjects millions of noncitizens to mandatory prolonged detention without the opportunity for release on bond, no matter how long they have resided within the country." *Maldonado Vazquez v. Feeley*, 2025 WL 2676082, at *1 (D. Nev. Sept. 17, 2025).

For decades, the government has treated individuals who entered without inspection as subject to discretionary detention under 8 U.S.C. §1226(a), not mandatory detention under §1225(b)(2). *Rodriguez v. Bostock*, 2025 WL 2782499,

---

https://tinyurl.com/y4wxbjze (immigration detention costs $165 per person per day); *see also* Congressional Research Service, *Understanding the FY2026 DHS Budget Request*, Sept. 5, 2025, at 6, https://www.congress.gov/crs-product/R48704#ifn12.

[5] Such tactics include weakening requirements for warrantless arrests, *see Escobar Molina v. U.S. Dep't of Homeland Sec.*, 2025 WL 3465518, at *24-26 (D.D.C. Dec. 2, 2025), and setting aggressive daily ICE arrest quotas, *id.* at *23, which have vastly increased illegal immigration arrests, including of numerous U.S. citizens. Nicole Foy, *We Found That More Than 170 U.S. Citizens Have Been Held by Immigration Agents*, ProPublica (Oct. 16, 2025), https://tinyurl.com/3emhk83z.

at *24–26 (W.D. Wash. 2025). Under §1226(a), if DHS declines to release a noncitizen on bond or "conditional parole," §1226(a)(2)(A)–(B), the noncitizen "is entitled to an individualized [bond] hearing before an IJ to determine whether detention is necessary during the course of his immigration proceedings." *Martinez v. Larose*, 968 F.3d 555, 560 (6th Cir. 2020); *see* 8 C.F.R. §§236.1(d)(1), 1236.1(d)(1). By contrast, §1225(b)(2) gives DHS unrestricted authority to detain noncitizens without any hearing, even if they pose no danger or flight risk.

Detention under §1225(b)(2) applies to certain "applicants for admission" who are "seeking admission." Such detention is considered "mandatory" because it requires that noncitizens be held without the opportunity for bond. *See Jennings v. Rodriguez*, 583 U.S. 281, 302 (2018). The only administrative avenue for release from detention under §1225(b) is "humanitarian parole" under 8 U.S.C. §1182(d)(5), which is granted at DHS's discretion "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *See Jennings*, 583 U.S. at 288. However, DHS has a new policy generally barring §1182(d)(5) parole.[6]

This year, DHS and DOJ abruptly decided that their interpretation of these thirty-year-old statutory provisions was incorrect, and that §1226 only applies to

---

[6] *See D.N.N. v. Bacon*, No. 25-cv-01613-JRR (D. Md. June 30, 2025), Dkt. No. 40-3; *Arostegui-Maldonado v. Baltazar*, 794 F. Supp. 3d 926, 944 (D. Colo. 2025). DHS has released fewer than 75 noncitizens a month on average for the ten months ending November 30, 2025, despite an average daily population of over 51,400 during that time. FY 2025 and FY 2026 ICE Statistics, https://tinyurl.com/47rypnft.

noncitizens previously admitted to the United States, with §1225(b) mandating

detention for all noncitizens present without admission. *Matter Yajure Hurtado*, 29

I&N Dec. 216 (BIA 2025); Memo from Todd Lyons to All ICE Employees,

"Interim Guidance," July 8, 2025, available at https://tinyurl.com/2syf8r54 at 3.

> ### 2. Courts Overwhelmingly Reject the New Interpretation, Yet Most Noncitizens Are Unable to Challenge their Unlawful Detention.

Courts have widely rejected this radical new reading in the habeas litigation

that has exploded to fill the vacuum left by the blanket denial of bond hearings.

"[T]he overwhelming, lopsided majority" of district courts in every circuit where

this question has arisen have rejected the new policy and "held that the law still

means what it always has meant." *Mercado v. Francis*, 2025 WL 3295903, at *4

(S.D.N.Y. Nov. 26, 2025). As of early January 2026, more than 300 judges had

rejected the government's position in more than 1,600 cases.[7]

People who have successfully challenged their statutory misclassification

through habeas are a small minority of the fortunate. The recent "flood" of habeas

petitions "doesn't account for the countless people picked up off the streets who

don't have lawyers and who can't effectively seek relief" in federal court. *Diallo v.

Joyce*, 2025 WL 3718477, at *6 (S.D.N.Y. Dec. 23, 2025). Detained noncitizens

---

[7] Kyle Cheney, *Hundreds of Judges Reject Trump's Mandatory Detention Policy, With No End in Sight*, Politico (Jan. 5, 2026), https://tinyurl.com/bdprvb68 .

have no right to appointed counsel, *see* 8 U.S.C. §1229a(b)(4)(A), and are

represented only if they can find and fund an attorney (from behind bars) or access

pro bono counsel. In the years prior to the recent detention surge, only 31 percent

of detained noncitizens were represented in removal proceedings.[8] That figure—

which does not reflect much lower rates of representation in related federal

litigation—has likely shrunk as detention numbers have climbed and the

administration has cut funding to legal access and representation programs.[9]

But even for those with counsel, attorney-client communication is

challenging. *E.g.*, *Gonzalez v. Noem*, 2025 WL 3204602, at *1 (N.D. Ill. Nov. 17,

2025) (noting "testimony concerning systematic lack of access to counsel" at ICE

facility, including attorneys testifying "it is nearly impossible to reach their

clients"); *Carlos v. Noem*, 2025 WL 2896156, at *4 (D. Nev. Oct. 10, 2025)

(similar). For those who must proceed without counsel while detained, restricted

ability to contact the outside world and dizzyingly frequent transfers make federal

litigation largely unfeasible. *See Munoz Materano v. Arteta*, 2025 WL 2630826, at

*19 (S.D.N.Y. Sept. 12, 2025) (ICE transferred petitioner "at least ten times, to

eight different detention centers in four different states"). The government's new

---

[8] Ingrid V. Eagly et al., Access to Counsel in Immigration Court, Revisited, 111 Iowa L. Rev. 1, 26 (2025), https://ssrn.com/abstract=5744804.
[9] *See id.* at 10, 28-29; Ingrid Eagly & Steven Shafer, *Yes, Immigrants Have the Right to a Lawyer, but Finding One Is Getting Harder*, L.A. Times (Nov. 26, 2025), https://tinyurl.com/3fvnwess.

interpretation of §1225(b) has thus ensnared many thousands of noncitizens who a few months ago could have been released to pursue immigration proceedings while at liberty. Despite the near-universal rejection of this interpretation, most noncitizens subjected to it remain detained.

### B. The Administration's New Policy Targets Noncitizens Whose Mandatory Detention Serves No Purpose.

Hundreds of district court decisions invalidating the government's rewriting of the law highlight the immeasurable toll of arbitrary imprisonment on the person detained and their community. A key theme—apart from the error of the agency's new interpretation—is that the new regime results in arbitrary detention and does not protect the community or prevent flight, the only legitimate purposes of civil immigration detention. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). That is by design.

People targeted by the policy are often arrested at random, or after DHS confirms they are looking for someone else. *E.g.*, *Contreras-Cervantes v. Raycraft*, 2025 WL 2952796, at *3 (E.D. Mich. Oct. 17, 2025) (petitioners stopped during routine traffic stops, at gas stations, or "just simply driving"); *Rocano Buestan v. McShane*, 2025 WL 3496361, at *1 (S.D.N.Y. Dec. 5, 2025) (DHS was looking for someone else); *Rodriguez v Knight*, 2025 WL 3228285, at *2, (D. Idaho Nov. 19, 2025) (the government's "only apparent interest in detaining" petitioner "is to fulfill an arrest quota of 3,000 immigration arrests per day"). Scores of people now

mandatorily detained were previously released by DHS itself or an IJ, after finding no danger or flight risk. *E.g.*, *Bethancourt Soto v. Soto*, 2025 WL 2976572, at *1 (D.N.J. Oct. 22, 2025); *Pacheco Mayen v. Raycraft*, 2025 WL 2978529, at *1 (E.D. Mich. Oct. 17, 2025).

DHS routinely makes no effort to justify continued custody on an individualized basis. *E.g.*, *Estrada-Samayoa v. Cruz*, 2025 WL 3268280, at *5–6 (E.D. Cal. Nov. 24, 2025) (government "does not dispute" that the petitioner poses no flight risk or danger). Instead, reliance on §1225(b)(2) means DHS need not articulate any flight risk or public safety rationale for detention. Indeed, over 70% of people in DHS custody have no criminal conviction. Data shows that DHS has "shifted focus completely away" from prioritizing enforcement against people with serious criminal records.[10]

---

[10] David J. Bier, *5% of People Detained by ICE Have Violent Convictions, 73% No Convictions*, CATO Institute (Nov. 24, 2025), https://tinyurl.com/2sy9cu2b; *see also* Albert Sun, *Most Immigrants Arrested in City Crackdowns Have No Criminal Record*, N.Y. Times (Dec. 4, 2025), https://tinyurl.com/4c7bd2jx.
    The new policy also renders "meaningless" *Congress's* recent decision to subject a discrete group of inadmissible noncitizens to mandatory detention under §1226(c): those with specific criminal conduct. *Helbrum v. Williams Olson*, 2025 WL 2840273, at *4 (S.D. Iowa Sept. 30, 2025); Laken Riley Act, Pub. L. 119-1, 139 Stat. 3 (2025).  Congress's 2025 amendment to §1226 adding §1226(c)(1)(E) has no impact under the government's interpretation, which dictates that all unadmitted noncitizens are subject to §1225(b) and thus eligible for parole under §1182(d)(5).

Instead, ICE has used its new mandatory detention policy to arbitrarily imprison people who have lived here for decades, noncitizens whom DHS or an IJ previously decided merited release, people with bona fide claims pursuing lawful immigration status, survivors of persecution and crime, and teenagers granted deferred action, among many others.

### 1. Long-Term Residents

Scores of those now subjected to mandatory detention are longtime U.S. residents with deep community ties. *E.g.*, *Romero v. Francis*, 2025 WL 3110459, at *1 (S.D.N.Y. Nov. 6, 2025) (grandfather in U.S. for 30 years, working at same Italian restaurant since 2009); *Valerio v. Joyce*, 2025 WL 3251445, at *1 (D.N.J. Nov. 21, 2025) (father of six in U.S. for 41 years); *Quispe v. Crawford*, 2025 WL 2783799, at *1 (E.D. Va. Sept. 29, 2025) (business owner and father in U.S. for 19 years, arrested by unidentified officers in Home Depot parking lot); *Martinez v. Noem*, 2025 WL 2965859, at *1 (W.D. Tex. Oct. 21, 2025) (father of five in U.S. for 22 years); *Castillo v. Andra-Ybarra*, 2025 WL 3251223, at *2 (D.N.M. Nov. 21, 2025) (business owner with 25 employees, financially supporting two children in college, in U.S. for 26 years).

Parents of innumerable children have disappeared from their lives. "[T]o be unlawfully separated from one's family is to have life's most essential bond

severed, leaving an injury that may well never be fully healed." *Mata Fuentes v. Olson*, 2025 WL 3524455, at *6 (D. Minn. Dec. 9, 2025).

Take Abel Amigon Sanchez, who has been living here for 19 years and working the same job for the last 15. He owns a home in the Chicago suburbs, is a union member, has no criminal history, and is a single parent to 6-year-old twin girls. *Sanchez v. Olson*, 2025 WL 3004580, at *1 (N.D. Ill. Oct. 27, 2025). In October, ICE officers arrested him at work, leaving the children without their caregiver. *Id.*

The August arrest of Gildardo Escobar-Salgado was "'shattering' for his family." *Escobar Salgado v. Mattos*, 2025 WL 3205356, at *6 (D. Nev. Nov. 17, 2025). He has lived in Utah over 20 years and "is a devoted partner and father," to his four U.S.-citizen children, ages 8, 10, 11, and 17. *Id.* Without his income, the family lost their car and home. "The children [were] devastated by his absence— their youngest daughter crie[d] through the nights and their sons have emotionally shut down." *Id.* Denny's, where Mr. Escobar-Salgado has worked since 1999, held his position because "he is such a valued employee." *Id.*

Many detained without bond have been here long enough to qualify for cancellation of removal, a form of relief in removal proceedings for those who have lived here at least 10 years, have minimal criminal history and whose removal would cause exceptional hardship to a lawful permanent resident (LPR) or U.S.-

citizen immediate relative.[11] For decades, people eligible for this relief were routinely granted bond while awaiting a decision. DHS's about-face leaves these longtime community members imprisoned unless they can file a habeas petition. *E.g.*, *Arce v. Trump*, 2025 WL 2675934, at \*1–2 (D. Neb. Sept. 18, 2025) (noting prima facie eligibility for cancellation for Iowa father in U.S. for 24 years and the novelty of DHS's new interpretation of §1225(b)(2)).

### 2. People with Ongoing Immigration Processes

DHS is also targeting people already on the government's radar because they are in immigration proceedings or have voluntarily provided their information to authorities to pursue congressionally authorized immigration benefits. The decision to mandatorily detain these individuals, whose presence the government previously permitted, amounts to a bait-and-switch. It penalizes compliance with immigration legal processes, including by targeting people showing up for appointments with DHS or immigration court. *E.g.*, *Alva v. Noem*, 2025 WL 3281211 (E.D. Cal. Nov. 25, 2025); *J.U. v. Maldonado*, 2025 WL 2772765, at \*1 (E.D.N.Y. Sept. 29, 2025).

For example, DHS is detaining people with pending applications for lawful status. In many such cases, immigration judges previously closed or dismissed removal proceedings on this basis. *E.g.*, *Diaz Diaz v. Mattivelo*, 2025 WL

---

[11] 8 U.S.C. §1229b(b)(1).

2457610, at \*1-2 (D. Mass. Aug. 27, 2025); *Merino v. Ripa*, 2025 WL 2941609, at \*1-2 (S.D. Fla. Oct. 15, 2025).

This includes Brenda Rojano Gonzalez, a young mother who came to the U.S. as a child. *Rojano Gonzalez v. Sterling*, 2025 WL 3145764, at \*1 (N.D. Ga. Nov. 3, 2025). She lives in Georgia with her U.S.-citizen family and started the process of becoming a LPR four years ago. U.S. Citizenship and Immigration Services (USCIS), which is part of DHS, approved her application; all that remains is a visa interview. ICE arrested her after a traffic stop and held her under §1225(b)(2) despite "no evidence" that "she is a risk of flight or a danger to the community." *Id.* at \*8.

Similarly, Armando Estrada-Samayoa is married to a U.S. citizen and has an approved immigrant visa petition, which was the basis for administrative closure of his removal proceedings in 2022. *Estrada Samayoa*, 2025 WL 3268280, at \*1. He is a "deeply involved father," offering "stability, guidance, and a secure home environment that is centered on family values and mutual support" to his three children. *Id.* at \*2. "He provides daily support and caretaking for his spouse, who suffers from multiple serious medical conditions, and provides medical monitoring and care to his youngest child." *Id.* After his arrest, his seventeen-year-old son was hospitalized with a mental health crisis, which his physician attributed to his father's arrest. *Id.*

In some of the most puzzling cases, DHS argues it must detain recipients of Deferred Action for Childhood Arrivals (DACA). DACA holders, who have been in the country since at least 2007, are "considered 'lawfully present' and cannot be removed from the United States," and DACA generally cannot be revoked without pre-termination notice and an opportunity to respond. *Santiago v. Noem*, 2025 WL 2792588, at *1 (W.D. Tex. Oct. 2, 2025) (citing 8 C.F.R. §§236.21(c)(1), (3), 236.23(d)(1)). DACA recipients undergo a background check and are eligible for work authorization. *Gamez Lira v. Noem*, 2025 WL 2581710, at *3 (D.N.M. Sept. 5, 2025).

When forklift operator and DACA recipient Paulo Gamez Lira was arrested, he was "in his driveway along with two of his [four] children," preparing to take his child to the doctor. *Id.* at *4. He was arrested by "seven ununiformed men, who did not identify themselves as law enforcement," and "no grounds for the arrest were articulated." *Id.* at *1. No-bond detention of DACA recipients like Mr. Gamez Lira, previously unheard of, now appears common. *E.g.*, *Santiago*, 2025 WL 2792588, at *2; *Guerrero v. Noem*, 2025 WL 3520407, at *1 (W.D. Mich. Dec. 9, 2025); *Belsai D.S. v. Bondi*, 2025 WL 2802947, at *2 (D. Minn. Oct. 1, 2025).

### 3. Survivors of Abuse, Violence, and Trafficking

Our immigration laws were designed to provide safe haven in the form of asylum and paths to status for survivors of crime, trafficking, and abuse.[12] The statutory scheme acknowledges that to make these protections meaningful, applicants must be able to remain in the United States while awaiting permanent status. They are thus generally eligible for work authorization, and T and U visa and VAWA applicants are often eligible for deferred action,[13] through which noncitizens are "considered to be in a period of stay authorized under USCIS policy for the period deferred action is in effect." *Sepulveda Ayala v. Bondi*, 794 F. Supp. 3d 901, 912–13 (W.D Wash. 2025) (citation omitted). All unadmitted applicants for humanitarian protection are now subject to no-bond detention, undercutting this statutory scheme.

For instance, in October 2025, DHS detained Elhassen Ndiaye, who "suffered severe persecution for his sexuality in Mauritania, where homosexuality is illegal and punishable by death." *Ndiaye v. Jamison*, 2025 WL 3229307, at *1

---

[12] 8 U.S.C. §1101(a)(15)(T), (U) (T visas for trafficking survivors; U visas for survivors of crimes cooperating with law enforcement); *id.* §1158 (asylum); §§1101(a)(51), 1154(a)(1)(A)(iii), (B)(iii) ("VAWA" (Violence Against Women Act) protection for people abused by U.S.-citizen and LPR family members).

[13] 8 U.S.C. §§1154(a)(1)(D)(i)(II), (IV), 1158(d)(2); 8 C.F.R. §§204.2(c)(6)(i), (e)(6)(i), 214.14(d)(2), 214.205(c); *see* 22 U.S.C. §7105(c)(3) (law enforcement may apply for "continued presence" for trafficking victims to remain in the country to facilitate investigation and prosecution of traffickers).

(E.D. Pa. Nov. 19, 2025). "[H]e was thrown off a roof by his intolerant father and later arrested and tortured by law enforcement." *Id.* Mr. Ndiaye turned himself in to seek asylum shortly after his arrival in 2023. He was awaiting his asylum hearing when ICE arrested him, although he has work authorization, "complied with all the conditions of his release, [and] attended every check-in." *Id.*

Mr. Ndiaye is one of scores of people seeking asylum newly subjected to mandatory detention. *E.g.*, *Quispe-Ardiles v. Noem*, 2025 WL 2783800, at *1–2 (E.D. Va. Sept. 30, 2025) ("loving and involved grandfather" arrested at court date setting hearing on his asylum application); *Kashranov v. Jamison*, 2025 WL 3188399, at *2 (E.D. Pa. Nov. 14, 2025) (Alexey Navalny supporter who opposed Russia's war in Ukraine mandatorily detained while asylum application pending); *Ballestros v. Noem*, 2025 WL 2880831, at *1 (W.D. Ky. Oct. 9, 2025) (asylum applicant who fled Colombia because she "fear[ed] for her life" arrested while application was pending). One court found a petitioner "'was detained simply because' he was readily identified by [DHS] as a noncitizen engaged in the process of petitioning for asylum." *Yupangui v. Hale*, 2025 WL 3207070 (D. Vt. Nov. 17, 2025) (citation omitted).

Applicants for other humanitarian protection are also now regularly detained, despite plain eligibility for relief. After being targeted by Nicolas Maduro's security forces, Enzzo Lopez-Arevelo fled Venezuela and entered the

U.S. in 2022. Immigration officials released him to pursue asylum; he moved to Florida and was the victim of a "labor trafficking nightmare," working "more than sixty hours per week under dangerous, grueling conditions," without safety equipment or his promised wages. *Lopez-Arevelo v. Ripa*, 2025 WL 2691828, at *1 (W.D. Tex. Sept. 22, 2025) (cleaned up). He sued his abusive employer and reported the trafficking to law enforcement, resulting in a grant of continued presence valid until August 2027. *Id.* at *2. He has work authorization and pending T visa and asylum applications; nevertheless, DHS argues he is subject to mandatory detention. *Id.* at *2, 7. *See also, e.g.*, *Alvarez Ortiz v. Freden*, 2025 WL 3085032, at *2 (W.D.N.Y. Nov. 4, 2025) (petitioner mandatorily detained despite USCIS determination of prima facie VAWA eligibility); *Cortez-Gonzalez v. Noem*, 2025 WL 3485771, at *1 (D.N.M. Dec. 4, 2025) (petitioner who came to the U.S. 20 years ago as an infant mandatorily detained while T visa application pending); *Mata Fuentes*, 2025 WL 3524455 at *1 (father of three U.S.-citizen children with bona fide determination on U visa application, work permit, and deferred action mandatorily detained); *Patel v. Hardin*, 2025 WL 3442706, at *1 (M.D. Fla. Dec. 1, 2025) (similar).

### 4. Young Adults with Special Statutory Protections

ICE routinely applies its new detention mandate to young people who came here alone as children or have been abused or abandoned by their parents.

Congress created special statutory protections for these youth. Children who enter the country alone are cared for by the Office of Refugee Resettlement;[14] even after turning 18, they are entitled to special protections.[15] In addition, young people who have been abused, abandoned or neglected by a parent are eligible for Special Immigrant Juvenile Status (SIJS).[16] Those with SIJS are eligible for LPR status but must wait years after their petitions are approved because of the backlog in immigrant visas. DHS previously granted deferred action to these youth so they could remain here while waiting. *See A.C.R. v. Noem*, 2025 WL 3228840, at *2–3 (E.D.N.Y. Nov. 19, 2025) (describing SIJS deferred action program).

Despite Congress's clear concern for this vulnerable population, DHS is explicitly targeting young people for mandatory detention, including former unaccompanied children and SIJS grantees. *E.g.*, *Campos-Flores v. Bondi*, 2025 WL 3461551, at *1–2 (E.D. Va. Dec. 2, 2025); *De Leon Hernandez v. Bondi*, 2025 WL 3217037, at *1 (W.D. La. Nov. 18, 2025); *Del Cid v. Bondi*, 2025 WL 2985150, at *6–8 (W.D. Pa. Oct. 23, 2025); *Merino*, 2025 WL 2941609, at *1–2. When 18-year-old Luis appeared for a routine ICE check-in, an officer told him "that ICE is going down a list of all unaccompanied children who have turned 18 and entered without inspection in order to detain them." *Sandoval v. Rokosky*, 2025

---

[14] 8 U.S.C. §1232(b)(1).
[15] *E.g.*, 8 U.S.C. §§1232(c)(2)(B), 1158(b)(3)(C).
[16] 8 U.S.C. §1101(a)(27)(J).

WL 3204746, at *1 (D.N.J. Nov. 17, 2025). ICE detained Luis, who was living

with his approved sponsor, despite his pending SIJS and asylum applications. *Id.*

Similarly, ICE arrested F.S.S.M., whose father abandoned him as a baby and

whose mother failed to protect him from gang violence, even though he had

approved SIJS and deferred action until 2027. *F.S.S.M. v. Wofford*, 2025 WL

3526671, at *1 (E.D. Cal. Dec. 9, 2025). ICE provided no reason for his arrest. *Id.*

For a week, F.S.S.M. "was held in a closed room furnished with only metal seats

where he endured unsanitary conditions, intense cold, severe overcrowding, went

without food for two consecutive days, was forced to sleep on the floor," with no

mattress or blanket, "with the lights constantly on, and was denied access to a

shower or clean clothes." *Id.* at *2.

### C. The Impact of the New Detention Policy Underscores its Arbitrariness.

#### 1. Abusive Detention

ICE's no-bond detention takes place in a network of over 200 correctional

facilities—county jails, prisons, military bases, and private detention facilities—as

well has over 100 temporary staging areas.[17] While immigration custody is

designated as civil, conditions have always resembled prisons. *See Velasco Lopez*

*v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) (noncitizen was "incarcerated under

---

[17] ICE, *Detention Facilities,* https://www.ice.gov/detention-facilities (June 25, 2025); Vera Institute for Just., *More People Are in Immigration Detention Than Ever Before* (Oct. 2, 2025), https://tinyurl.com/sf29ev5j.

conditions indistinguishable from those imposed on criminal defendants sent to prison"); *United States v. Estrada-Mederos*, 784 F.3d 1086, 1091 (7th Cir. 2015) (noting the similarities between immigration custody and criminal incarceration "are too strong to ignore").

Through its mass detention campaign, the government has exacerbated pre-existing systemic problems including severely overcrowding ICE detention centers.[18] The agency is using holding cells and tents not fit for long-term stay.[19] And DHS has all but eliminated detention oversight, gutting the Office for Civil Rights and Civil Liberties and the Office of the Immigration Detention Ombudsman.[20]As a result, many of the people subjected to mandatory detention face inhumane, often dangerous, conditions.[21]

---

[18] Miriam Jordan & Jazmine Ulloa, *Concerns Grow Over Dire Conditions in Immigrant Detention*, N.Y. Times (July 1, 2025), https://tinyurl.com/msyv8mdz; TRACImmigration, *ICE Contractual Capacity and Number Detained: Overcapacity vs. Overcrowding* (July 8, 2025), https://tinyurl.com/78dpbumx.

[19] Casey Tolan & Isabelle Chapman, *Immigrants spend days in 'miserable' ICE hold rooms, violating longstanding policy*, CNN (Sept. 8, 2025), https://tinyurl.com/hmchsr86.

[20] José Olivares, *Gutting of Key US Watchdog Could Pave Way for Grave Immigration Abuses, Experts Warn*, The Guardian (Nov. 30, 2025), https://tinyurl.com/ycxax35w.

[21] *See* Letter from ACLU et al., on Coercive Third Country Deportations and Abusive Conditions of Confinement in Immigration Detention at Fort Bliss, TX to Todd Lyons, ICE Director, et al. (Dec. 8, 2025), https://tinyurl.com/52amp87z; Amnesty International, *Torture and Enforced Disappearances in the Sunshine State* 26–53 (2025), https://tinyurl.com/5x5jft8z; Sen. John Ossoff, Medical Neglect & Denial of Adequate Food or Water in U.S. Immigration Detention (Oct. 2025), https://tinyurl.com/mpvtvzmk.

Yury Aguiriano Romero, whom ICE held in "a temporary holding facility not designed for longterm detention," *Romero v. Hyde*, 795 F. Supp. 3d 271, 275 n.8 (D. Mass. 2025), recounted:

> I was forced to sleep on the cold floor. There was not enough food, and sometimes we were only given crackers. We were also not given sanitary pads for those of us[ ] who were on our period. We were forced to share and divide up three pads among all [eighteen] of us.

*Id.*; *see also Mercado*, 2025 WL 3295903, at *3 n.16 (describing "holding rooms" that are "overcrowded, provide inadequate sleeping conditions, are unsanitary, deny basic personal hygiene products as well as sufficient food and water, lack adequate medical care, and suffer from barriers to attorney-client communication").

Conditions at long-term facilities are similar. While in custody, Cristian Aguilar Merino—a survivor of abuse with SIJS and deferred action—did not have a bed, was "verbally abused by guards, and fed expired food." *Merino*, 2025 WL 2941609, at *1–2. Alessandra De Fatima Lomeu, who has lived here for 20 years and is married to a U.S. citizen, "was subjected to unsanitary conditions, lack of access to medications for her serious medical needs, and other punitive conditions such as overcrowding, frigid and painful sleeping conditions, denial of access to bathroom facilities overnight, and meals 'identical to cat food.'" *Lomeu v. Soto*, 2025 WL 2981296, at *1–3 (D.N.J. Oct. 23, 2025) (citation omitted).

For people needing medical care, conditions are dire. Quirino Guerrero Lepe, a California resident for 32 years, suffered a stroke prior to his arrest; while detained, "the entire right side of his body [went] numb" and he experienced "intolerable" pain. *Lepe v. Andrews*, 2025 WL 2716910, at *1, 9 (E.D. Cal. Sept. 23, 2025). His doctors reported that he is at "very high risk for stroke, blood clots and a heart attack," and attended his bond hearing to request his release to continue treatment—but the IJ denied bond based on *Yajure Hurtado*. *Id.* at *2, 9.

Vicente Yupangui, who has a history of heart attacks, suffered from "nausea and dizziness at his detention facility because he d[id] not have adequate access to drinking water." *Yupangui*, 2025 WL 3207070, at *1. Brisa Vasquez Alva was sick "multiple times" while detained, but "her requests for medical assistance" were "routinely ignored." *Alva v. Noem*, 2025 WL 3281211, at *4 (E.D. Cal. Nov. 25, 2025). Edward Quispe was held "without guaranteed access to vital medications." *Quispe*, 2025 WL 2783799, at *8.[22]

ICE has also abandoned its policy not to detain most people who are pregnant, nursing, or recently postpartum and has subjected countless such

---

[22] At least 32 people died in immigration custody in 2025—matching the previous record in 2004. Maanvi Singh et al., *2025 was ICE's deadliest year in two decades. Here are the 32 people who died in custody*, The Guardian (Jan. 4, 2026), https://tinyurl.com/4j86j89f.

individuals to mandatory detention.[23] Post-natal care is dangerously deficient. ICE arrested Nayra Guzmán, eight days after giving birth prematurely to her daughter via Cesarean section, while she was leaving to visit the baby in the NICU. *G.Z.T. v. Smith*, No. 1:25-cv-12802, ECF 14 at 2 (N.D. Ill. Oct. 21, 2025).[24] She was placed in a holding facility with "limited access to food and water," and no breast pump, and "was left to manage the pain of her C-section recovery" and her Type 1 diabetes with only the supplies in her backpack.[25]

Ammy Vargas Baquedano was detained while still breastfeeding her child. "As a result of her sudden withdrawal from her baby and the inability to feed, she suffered the painful condition of having her milk ducts clog. There is no indication she was provided a breast pump or other assistance to maintain her milk supply." *Espinoza v. Kaiser*, 2025 WL 2675785, at *12 n.13 (E.D. Cal. Sept. 18, 2025).

Antonia Aguilar Maldonado was separated for weeks from her baby who breastfed because he could not digest other milk. Her breast milk turned green in detention. As a district judge noted in ordering her release, "the harm of separating

---

[23] *See* Rachel Uranga, *Pregnant Immigrants Held for Months in Detention Despite Rules Against It*, L.A. Times (Dec. 3, 2025), https://tinyurl.com/2mkhm8y8.
[24] Mel Leonor Barclay & Shefali Luthra, *A Cicero Woman's Baby Was in the NICU. She Was In ICE Detention.* Chi. Sun-Times (Dec. 8, 2025), https://tinyurl.com/mrx5t7d3.
[25] *Id.*

a nursing mother and child is self-evident." *Maldonado v. Olson*, 795 F. Supp. 3d 1134, 1141–42, 1154–55 (D. Minn. 2025).

Those detained also report an appalling lack of prenatal care. Marianela Leon Espinoza, two months into a high-risk pregnancy, received no prenatal care in detention. *Espinoza*, 2025 WL 2675785, at *1; *Espinoza v. Kaiser*, No. 1:25-cv-1101, ECF 2 ¶¶58, 110 (E.D. Cal. Aug. 29, 2025). Angie Loren Rodriguez Rodriguez learned she was pregnant in detention, where "she was not provided with adequate food, medical care, or pre-natal educational materials." She suffered a miscarriage on the day she filed a habeas petition. *Rodriguez v. Kaiser*, 2025 WL 2855193, at *1 (E.D. Cal. Oct. 8, 2025).

## 2. Coercion to Abandon Rights

One intended consequence of the new detention scheme is the mass relinquishment of statutory rights by people who might otherwise be eligible for humanitarian protection or immigration benefits. A frequent outcome of detention in this era is "coerced voluntary departure," in which noncitizens give up lawful pathways to status, either because of intense, often violent pressure by ICE officials, or because of the abusive conditions detailed above. *E.g.*, Decl. of Fredy Cazarez Gonzalez, *Gonzalez v. Noem*, No. 25-13323, ECF 2-40 ¶¶15-18 (N.D. Ill. filed Oct. 30, 2025) (declarant forced to sign untranslated voluntary departure paperwork under threat of physical injury); Decl. of Julio Armenta, *Ruiz v. ICE*,

No. 25-cv-9757, ECF 22-33 ¶¶5, 13 (N.D. Cal. filed Dec. 1, 2025) (22-year

resident with U.S.-citizen child and no criminal history considering voluntary

departure because of dangerous detention conditions and lack of medical care);

Decl. of Hugo Sanchez Trillos, *Mercado v. Noem*, No. 25-cv-6568, ECF 27 ¶20

(S.D.N.Y. filed Aug. 8, 2025) (describing detained U visa applicant pressured to

sign English-only deportation documents).[26]

These are not isolated instances of rogue officers acting independently: they

represent a nationwide pattern. *See, e.g.*, *Gonzalez* 2025 WL 3204602, at *1

(describing testimony about ICE officers at Broadview pressuring detainees into

signing English-only documents that may "authorize voluntary deportation or

otherwise forfeit rights to hearings or other process under the immigration laws"

while misrepresenting the documents' contents); Amnesty International, *Torture

and Enforced Disappearances in the Sunshine State*, *supra* n.2, at 41 (noting

widespread reports that people at "Alligator Alcatraz are being coerced into

signing voluntary departure removal forms and are being deported [] without due

process"), 52 (legal services organization in Miami describing the trend that people

accept "self-deportation or voluntary departure [] because they'd rather get out of

---

[26] In particularly disturbing cases, after people with pending immigration proceedings resisted ICE's pressure to sign voluntary departure papers, ICE unlawfully removed them anyway. *E.g.*, Decl. of Darwin Lopez Castañon, *Escobar Molina*, No. 25-cv-3417, ECF 17-16 ¶13 (D.D.C. filed Oct. 3, 2025).

that facility, sleeping on the cold concrete floor with little access to food, medicine, or the outside world"). The dramatic expansion of mandatory detention has created conditions that enable DHS to brutally compel people into abandoning their statutory rights on a mass scale.

The experience of Jack Doe exemplifies this phenomenon. Mr. Doe raised his five children, including three U.S. citizens, as a single father. He has no criminal record and in his twenty years in the country had never been arrested until ICE detained him in September 2025. Decl. of Jack Doe, *Gonzalez v. Noem*, No. 1:25-cv-13323, ECF 2-38 ¶2 (N.D. Ill. filed Oct. 30, 2025). He has a son in college, two kids in elementary school, and a recently purchased home. *Id.* He had a work permit, owned a painting and renovation company, and paid taxes. *Id.* ¶¶2, 26.

Mr. Doe described his time at Broadview detention center as "torture," with severe overcrowding and freezing temperatures that prevented sleep, violent and abusive guards, and lack of food, water and basic hygiene items. *Id.* ¶¶4–20. Detained alongside him was a septuagenarian disabled man who urinated on himself because he could not reach the shared toilet. The guards kept him in the crowded communal room in his soiled clothing "for several days." *Id.* ¶21. In these degrading conditions, the guards asked Mr. Doe to accept removal, and tried to make other people do the same. *Id.* ¶¶27-29. In one instance, officers tried to force

a noncitizen to sign by injuring him so badly he was hospitalized; after he returned the officers assaulted him again. *Id.* ¶30. Mr. Doe would not agree to removal without legal process, citing his family and community ties. *Id.* ¶27. Instead, he repeatedly asked to call his lawyer, which ICE officers at Broadview never permitted. *Id.* ¶¶23, 28. Days later, ICE illegally deported Mr. Doe anyway. *Id.* ¶31.

This administration's new classification of almost all noncitizens as subject to mandatory detention strips thousands of people of any opportunity to return to their families, homes and jobs during their lengthy removal proceedings. Even for those who have an attorney, detention imposes an enormous burden while their case proceeds. Before, "asking for a bond hearing was simple;" now, a noncitizen who seeks liberty "must file a federal habeas corpus case[, which] takes real time" and most frequently, a lawyer with federal court, not just administrative, experience. *Y.Z. v. Soto*, 2025 WL 3564652, at *5 (D.N.J. Dec. 12, 2025). Petitioners suffer additional weeks or months of unlawful detention before prevailing in habeas. But even worse, habeas litigation is simply inaccessible for most people trapped in immigration detention today. The consequences for so many, like Mr. Doe, have been devastating.

## III.    CONCLUSION

Appellees' own stories illustrate the arbitrary and cruel nature of the government's new mandatory detention policy. They have all lived in this country for multiple years, developing ties and building families here, avoiding criminal contact, and applying for various forms of relief. Their detention without review served no legitimate purpose. Appellees' position represents the proper reading of Congress's statutory scheme and avoids the unnecessary and immense harms that the government's unlawful interpretation inflicts on innumerable people, including Appellees, their families and communities, and American taxpayers. For the foregoing reasons, Amici ask this Court to affirm the decisions below.

Dated: January 12, 2026

Respectfully submitted,

*/s/ Suchita Mathur*
Suchita Mathur*

*/s/ Rebecca Cassler*
Rebecca Cassler*

*/s/ Emma Winger*
Emma Winger*

American Immigration Council
PMB 2026
2001 L St. NW Suite 500
Washington, DC 20036
Tel: (202) 507-7537
smathur@immcouncil.org
rcassler@immcouncil.org
ewinger@immcouncil.org

*Attorneys for Amici Curiae* American Immigration Council and American Immigration Lawyers Association

*Not admitted to the Sixth Circuit Bar

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because the brief contains 6473 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365, in 14-point Times New Roman.

DATED: January 12, 2026                     */s/ Suchita Mathur*
                                              Suchita Mathur

**CERTIFICATE OF CONSENT**

I hereby certify, pursuant to Fed. R. App. P. 29(a)(2), that counsel for

Appellant and counsel for Appellees consented to *amici curiae* filing a brief in this

matter.

Dated: January 12, 2026                    */s/ Suchita Mathur*
                                           Suchita Mathur

**CERTIFICATE OF SERVICE**

I hereby certify that on January 12, 2026, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system. Participants in the case are registered CM/ECF users and will be served by the CM/ECF system.

Dated:  January 12, 2026                                      */s/ Suchita Mathur*
                                                                             Suchita Mathur