RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0139p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

JUAN MANUEL LOPEZ-CAMPOS (25-1965); JUAN CARLOS SANCHEZ ALVAREZ (25-1969); JOSE DANIEL CONTRERAS-CERVANTES; FREDY DE LOS ANGELES-FLORES; MARIELA VIRGINIA OCANDO-LEON; LUIS FELIPE JARQUIN-JARQUIN; DEBBIE VASQUEZ-CRUZ; JAIRO MANUEL GODOY-PEREZ; MARIFER DIAZ-ALCANTAR; MIGUEL ANGEL REYES-SANCHEZ (25-1978); JESUS JOSE PIZARRO REYES (25-1982),

        *Petitioners-Appellees*,

    *v.*

KEVIN RAYCRAFT, Immigration and Customs Enforcement, Acting Director of Detroit Field Office, Enforcement and Removal Operations (25-1965/1969/1978/1982); MARKWAYNE MULLIN, Secretary of U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY (25-1965/1969); TODD W. BLANCHE, Acting U.S. Attorney General; EXECUTIVE OFFICE OF IMMIGRATION REVIEW (25-1965),

        *Respondents-Appellants*.

> Nos. 25-1965/1969/1978/1982

───────────────

Appeals from the United States District Court
for the Eastern District of Michigan at Detroit.

Nos. 25-cv-12486 (25-1965); 25-cv-13073 (25-1978)—Brandy R. McMillion, District Judge;
No. 25-cv-12546 (25-1982)—Robert Jerome White, District Judge.

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.

No. 25-cv-01090 (25-1969)—Jane M. Beckering, District Judge.

Argued:  March 18, 2026

Decided and Filed:  May 11, 2026

Before:  COLE, CLAY, and MURPHY, Circuit Judges.

---

### COUNSEL

**ARGUED:** Benjamin Hayes, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. My Khanh Ngo, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, San Francisco, California, for all Appellees. **ON BRIEF:** Benjamin Hayes, Jesse D. Lorenz, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants. My Khanh Ngo, Michael K.T. Tan, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, San Francisco, California, Miriam J. Aukerman, Marty Berger, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Grand Rapids, Michigan, Judy Rabinovitz, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Ramis J. Wadood, Philip Mayor, Bonsitu Kitaba-Gaviglio, AMERICAN CIVIL LIBERTIES UNION FUND OF MICHIGAN, Detroit, Michigan, for all Appellees. Russell Reid Abrutyn, ABRUTYN LAW PLLC, Southfield, Michigan, for Appellee Pizarro Reyes. Amit Jain, RODERICK & SOLANGE MACARTHUR JUSTICE CENTER, Washington, D.C., Suchita Mathur, AMERICAN IMMIGRATION COUNCIL, Washington, D.C., Brianne J. Gorod, CONSTITUTIONAL ACCOUNTABILITY CENTER, Washington, D.C., for Amici Curiae.

CLAY, J., delivered the opinion of the court in which COLE, J., concurred. MURPHY, J. (pp. 25–62), delivered a separate dissenting opinion.

---

### OPINION

---

CLAY, Circuit Judge. In this consolidated appeal, Respondents appeal various district court grants of petitions for habeas corpus. Petitioners are noncitizens without lawful status who were detained pursuant to 8 U.S.C. § 1225(b)(2)(A).[1] The district courts granted Petitioners' habeas petitions, finding that the government did not lawfully detain Petitioners under § 1225(b)(2)(A) and that Petitioners' detention without a bond hearing violated their Fifth Amendment due process rights. For the reasons set forth below, we **AFFIRM** the district courts' judgments.

---

[1]We use the term "noncitizen" as equivalent to the statutory term "alien." *See Santos-Zacaria v. Garland*, 598 U.S. 411, 413 n.1 (2023).

## I.  BACKGROUND

### A.  Factual History

Petitioners are citizens of Mexico, El Salvador, Venezuela, Nicaragua, and Guatemala who have resided in the United States without lawful status for years.  Many of the Petitioners, like Juan Manuel Lopez-Campos, Juan Carlos Sanchez Alvarez, Jose Daniel Contreras-Cervantes, Fredy De Los Angeles-Flores, Debbie Vasquez-Cruz, Miguel Angel Reyes-Sanchez, and Jesus Jose Pizarro Reyes are parents to U.S.-citizen children.  Petitioners have lived in the United States for years without much incident outside of some minor traffic offenses.

All were arrested by U.S. Immigration and Customs Enforcement ("ICE") or Customs and Border Patrol agents, charged with entering the United States without inspection, and, pursuant to 8 U.S.C. § 1225(b)(2)(A)'s mandatory detention statutory scheme and the Board of Immigration Appeals' ("BIA") decision *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA 2025), detained without a determination of their flight risk and dangerousness.  Petitioners were mostly denied bond by an immigration judge ("IJ") because the IJs determined that they lacked jurisdiction to grant bond.

### B.  Procedural History

Petitioners filed their respective petitions for writs for habeas corpus in the Eastern and Western Districts of Michigan.  Petitioners averred that they were unlawfully detained under 8 U.S.C. § 1225(b)(2)(A), which requires mandatory detention, and should have instead been detained under 8 U.S.C. § 1226, which permits detention or release on bond or probation.  Petitioners also claimed that the government's failure to provide a bond hearing to determine whether they posed a flight risk or danger to others, under any detention statute, violated their due process rights.

The district courts for the Eastern and Western Districts of Michigan granted the petitions, agreeing with Petitioners that § 1226(a) governed their detention and thus Petitioners should have been afforded a bond hearing before an IJ under that statute.  *See Lopez-Campos v. Raycraft*, 797 F. Supp.3d 771, 786 (E.D. Mich. 2025); *Sanchez Alvarez v. Noem*, 807 F. Supp.3d

777, 787–88 (W.D. Mich. 2025); *Contreras-Cervantes v. Raycraft*, No. 25-cv-13073, 2025 WL 2952796, at *8 (E.D. Mich. Oct. 17, 2025); *Pizarro Reyes v. Raycraft*, No. 25-cv-12546, 2025 WL 2609425, at *7 (E.D. Mich. Sept. 9, 2025). With the exception of the district court in Petitioner Jesus Jose Pizarro Reyes' case, the district courts also determined the government's failure to provide a bond hearing violated Petitioners' Fifth Amendment due process rights.[2] *Lopez-Campos*, 797 F. Supp.3d at 784–85; *Sanchez Alvarez*, 807 F. Supp.3d at 788–90; *Contreras-Cervantes*, 2025 WL 2952796, at *9–10.

Following the district courts' orders granting Petitioners' habeas petitions, the government released every Petitioner without holding a bond hearing—except for Petitioner Ocando-Leon, who was released from custody prior to the district court's disposition of his case. The government's timely appeal followed.

## II.  DISCUSSION

### A.  Standard of Review

We review both a district court's grant of petitions for habeas corpus and questions of statutory interpretation *de novo*. *See Martinez v. Larose*, 968 F.3d 555, 558 (6th Cir. 2020); *Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 433 (6th Cir. 2019). We also review claims of the denial of due process *de novo*. *See Garza-Moreno v. Gonzales*, 489 F.3d 239, 241 (6th Cir. 2007).

### B.  Analysis

#### 1.  Statutory Background

Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), which, in relevant part, overhauled how noncitizens are removed from the United States. IIRIRA, Pub. L. No. 104–208, 110 Stat. 3009 (1996). Two different statutory schemes govern the detention of noncitizens pending completion of removal proceedings.

---

[2]Because the district court granted Petitioner Reyes' relief based on its statutory interpretation of 8 U.S.C. §§ 1225(b)(2)(A) and 1226, it declined to decide the merits of Petitioner's Fifth Amendment due process claim. *Pizarro Reyes*, 2025 WL 2609425, at *8.

"U.S. immigration law authorizes the Government to detain certain [noncitizens] seeking admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain [noncitizens] already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c)." *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018). The thrust of this appeal is whether a noncitizen detained within the interior of the United States who never affirmatively applied for admission is subject to 8 U.S.C. § 1225(b)(2)(A)'s mandatory detention scheme or 8 U.S.C. § 1226's permissive detention scheme.

Under 8 U.S.C. § 1225, a noncitizen "present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission." 8 U.S.C. § 1225(a)(1). Section 1225(b)(2)(A) provides in part that "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under [§ 1229a]." *Id.* § 1225(b)(2)(A). "The plain meaning of [§ 1225(b)(2)(A)] is that detention must continue . . . until removal proceedings have concluded." *Jennings*, 583 U.S. at 299. Noncitizens who fall under § 1225(b)(2)(A)'s ambit must be detained, subject to very narrow exceptions inapplicable to this appeal. *See* 8 U.S.C. § 1225(b)(2)(B).

Comparatively, § 1226 applies to noncitizens "arrested and detained pending a decision on whether the alien is to be removed from the United States." *Id.* § 1226(a). The Attorney General may release a noncitizen detained under § 1226 on bond or conditional parole, with the exception of noncitizens who "fall[] into one of several enumerated categories involving criminal offenses and terrorist activities." *Jennings*, 583 U.S. at 289; 8 U.S.C. §§ 1226(a)(2)(A)-(B), (c). On January 29, 2025, Congress amended § 1226 with the Laken Riley Act, excluding from this permissive detention scheme noncitizens who are inadmissible under § 1182(a)(6)(A), (6)(C), or (7), or are charged with certain crimes. 8 U.S.C. § 1226(c)(1)(E)(i)-(ii); Laken Riley Act, Pub. L. No. 119-1, 139 Stat. 3 (2025). Such noncitizens must be detained, subject to an exception to protect witnesses in ongoing criminal investigations under § 1226(c)(4). 8 U.S.C. § 1226(c)(4).

The Supreme Court in *Jennings* described the relationship between the two detention standards:

> In sum, U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2).  It also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c).

583 U.S. at 289.  Put differently, § 1225(b)(2)'s mandatory detention scheme applies to certain noncitizens who seek admission into the country, whereas § 1226's permissive detention scheme applies to all other noncitizens pending a decision on their removability, with exceptions.  Therefore, whether Petitioners were subject to mandatory detention without an individualized bond hearing hinges on which provision applies to them.

To date, hundreds of district courts and five of our sister circuits have already addressed this statutory interpretation issue.  *See Hernandez Alvarez v. Warden, Fed. Det. Ctr. Miami*, --- F.4th ---, 2026 WL 1243395 (11th Cir. 2026); *Barbosa da Cunha v. Freden*, --- F.4th ---, 2026 WL 1146044 (2d Cir. 2026); *Avila v. Bondi*, 170 F.4th 1128 (8th Cir. 2026); *Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026); *see also Castañon-Nava v. U.S. Dep't of Homeland Sec.*, --- F.4th ---, 2026 WL 1223250 (7th Cir. 2026).  For the reasons discussed below, we join the Second and Eleventh Circuits, and Judge Lee's individual opinion in *Castañon-Nava*, in holding that § 1225(b)(2)(A) does not apply to noncitizens like Petitioners.

### 2.  The Scope of 8 U.S.C. § 1225(b)(2)(A)

To determine § 1225's reach, we start with the statute's text.  "We first 'determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case,' relying on 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'"  *United States ex rel. Felten v. William Beaumont Hosp.*, 993 F.3d 428, 431 (6th Cir. 2021) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340–41 (1997)).  We look no further "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'"  *Robinson*, 519 U.S. at 340 (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 240 (1989)).  "But if the text is unclear, we may

look at . . . '[t]he broader context' of the statute and statutory purpose together to resolve the ambiguity." *Felten*, 993 F.3d at 431 (quoting *Robinson*, 519 U.S. at 345–46).

"Congress may . . . define a word or phrase in a specialized way or employ a term of art with long-encrusted connotations in a given field." *Feliciano v. Dep't of Transp.*, 605 U.S. 38, 45 (2025). "When Congress does not define a term, courts 'must give the words their ordinary, contemporary, common meaning, absent an indication Congress intended them to bear some different import.'" *United States v. Green*, 167 F.4th 832, 851–52 (6th Cir. 2026) (quoting *Grand Traverse Band of Ottawa & Chippewa Indians v. U.S. Att'y W. Dist. of Mich.*, 369 F.3d 960, 967 (6th Cir. 2004)).

Congress defined certain terms at issue here. As discussed, an "applicant for admission" is "[a]n alien present in the United States who has not been admitted or who arrives in the United States." 8 U.S.C. § 1225(a)(1). Next, "[t]he terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." *Id.* § 1101(a)(13)(A).

The parties disagree as to what Congress did not define: namely, what it means for a noncitizen to be "seeking" admission in § 1225(b)(2)(A). Contemporary dictionary definitions of "seek" or "seeking" confirm the words' requirement that the noncitizen engage in some affirmative act or attempt towards "admission." *See* Webster's New World College Dictionary 1215 (3d ed. 1996) (defining "seek" as "to try to find; search for; look for"); Merriam-Webster's Collegiate Dictionary 1057 (10th ed. 1997) (defining "seek" as "to resort to : go to" or "to go in search of : look for : to try to discover"); The American Heritage College Dictionary 1234 (3d ed. 1997) (defining "seek" as "[t]o try to locate or discover; search for"); *see also Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 149 (2023) ("To 'seek' is '[t]o ask for' or 'request.'" (quoting 14 Oxford English Dictionary, 877 (2d ed. 1989)). "Seeking" is the present participle of "seek," "which means that it 'expresses present action.'" *United States v. Stewart*, 73 F.4th 423, 425 (6th Cir. 2023) (quoting Present Participle, *Merriam-Webster*, https://www.merriam-webster.com/dictionary/present%20participle [https://perma.cc/N69K-XKHZ] (last visited Mar. 25, 2026)).

These definitions, in addition to Congress's definition of "admission," demonstrate that for a noncitizen to be "seeking admission" under § 1225(b)(2)(A), the noncitizen must actively be in search of lawful entry into the United States via inspection and authorization by an immigration officer. Noncitizens like Petitioners, who did not attempt lawful entry into the United States and are actively avoiding being inspected for lawful entry, are not "seeking admission" and are thus not subject to § 1225(b)(2)(A)'s mandatory detention scheme.

"[C]ontextual and structural considerations" buttress this conclusion. *Roberts v. Sea-Land Servs., Inc.*, 566 U.S. 93, 100 (2012). Congress could have easily drafted IIRIRA to extend § 1225(b)(2)(A)'s reach to all applicants for admission, but it chose not to do so.

First, Congress's decision to employ the phrase "seeking admission" implies a meaning distinct from the defined phrase "applicant for admission." "[W]hen Congress deliberately uses different words, we presume those words to 'have different meanings.'" *Bruce v. Adams & Reese, LLP*, 168 F.4th 367, 383 (6th Cir. 2026) (quoting *Tomaszcuk v. Whitaker*, 909 F.3d 159, 166 (6th Cir. 2018)). "Seeking admission," as used in § 1225(b)(2)(A), modifies the clause "in the case of an alien who is an applicant for admission." 8 U.S.C. § 1225(b)(2)(A). This was surely no accident. And when we also consider the ordinary meanings of "seek" and "seeking," there is no reason to depart from this presumption.

Second, the canon against surplusage further supports the phrase's independent meaning. Under this canon, "every word and every provision is to be given effect." *Nielsen v. Preap*, 586 U.S. 392, 414 (2019) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012)). This canon "is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013). If "seeking admission" did not have independent meaning, then Congress could have simply written § 1225(b)(2)(A) without the phrase and instead employed "applicant for admission." To hold otherwise would render § 1225(b)(2)(A)'s use of "seeking admission" superfluous.

The dissent claims to avoid this canon by asserting that the government's view of "seeking admission," which treats an "applicant for admission" as a subset of those "seeking

admission," operates within a nearby provision, 8 U.S.C. § 1225(a)(4). That provision allows the Attorney General to permit "[a]n alien applying for admission . . . to withdraw the application for admission and depart immediately from the United States." 8 U.S.C. § 1225(a)(4). According to the dissent, a noncitizen who entered without admission and whose unlawful presence makes him presently "seeking admission" can thus cease "seeking admission" by requesting immediate deportation.

This approach creates more problems than it solves. A noncitizen in the dissent's example would then be eligible for bond under § 1226(a) or, if ordered removed, eligible for release under § 1231 while the government secures his deportation because he would no longer be lawfully detained under § 1225(b)(2)(A). *See id.* § 1231(a)(6) (making inadmissible noncitizens ordered removed eligible for release from custody). Comparatively, an unadmitted noncitizen who may be eligible for certain forms of immigration relief and wants to stay in this country would not be eligible for bond under § 1226(a). Similarly, a noncitizen who abandons his application but whose withdrawal of his application is rejected at "the discretion of the Attorney General" would also be eligible for bond. *Id.* § 1225(a)(4). A bond eligibility rule which turns on these factors makes little sense. We must avoid "constru[ing] a statute in a manner that leads to absurd or futile results." *Nixon v. Mo. Mun. League*, 541 U.S. 125, 138 (2004). We therefore find that the dissent's interpretation does not ameliorate our surplusage concerns.

Third, if Congress intended for § 1225(b)(2)(A) to sweep Petitioners into mandatory detention, it likely would have implemented the same or similar safeguards for detention capacity that it built into other parts of IIRIRA. Congress knew that mandatory immigration detention was burdensome and took steps within IIRIRA to address those burdens. Take IIRIRA's enactment § 1226(c), which carved out certain groups from § 1226(a) for mandatory detention, as an example. Congress estimated that "[a]pproximately 45,000 criminal aliens are placed in deportation proceedings each year" and recognized the additional strain § 1226(c)'s mandatory detention of that group would place on the Executive. *See* H.R. Rep. No. 104-469, pt. 1, at 118, 120, 123 (1996). Indeed, Congress recognized that "[a] chief reason why many deportable aliens are not removed from the United States is the inability of the INS to detain

such aliens through the course of their deportation proceedings." *Id.* at 123. Thus, Congress included in IIRIRA a statutory escape hatch containing a transitional provision that delayed § 1226(c)'s effective date if invoked by the Attorney General due to "insufficient detention space and Immigration and Naturalization Service personnel." IIRIRA, Pub. L. No. 104-208, § 303(b)(2), 110 Stat. 3009, 586 (1996). The Executive took full advantage of this clause and deferred § 1226(c)'s full implementation for two years. *See* Brief for Immigration Law Scholars as Amici Curiae Supporting Petitioners-Appellees, at 17; *see also* Letter from Doris Meissner, Comm'r, INS to Henry J. Hyde, Chairman, S. Comm. on the Judiciary (Oct. 3, 1997) [https://perma.cc/7ZQA-BKKV].

Comparatively, Congress declined to include any such escape hatch or transitional provision for § 1225(b)(2)(A), which it enacted in the same statute. Congress observed that "[t]he Immigration and Naturalization Service (INS) estimated in 1992 that there were 3.4 million 'permanent' illegal aliens in the U.S. Of this population, roughly one-half entered legally by air and overstayed their visas and the other one-half entered without inspection by land or sea." H.R. Rep. No. 104-469, pt. 1, at 111. By IIRIRA's passage in 1996, Congress estimated "[t]he overall population of illegal aliens in the United States" to be "4,000,000 or more, with an annual increase of 300,000 to 400,000." *Id.* at 119. This is all to say that Congress was well aware of the gargantuanly large population of "applicants for admission" when it passed IIRIRA but expressed no concern as to the logistical nightmare implicated by the government's interpretation of § 1225(b)(2)(A)'s mandatory detention scheme. Adopting the government's view would therefore introduce an incongruent wrinkle: Congress carefully planned for an estimated tens of thousands of additional mandatory detainees under § 1226(c), and yet, in the very same statute, did nothing to address the millions of noncitizens that would be mandatorily detained under § 1225(b)(2)(A). Such a view strains reason and strongly suggests that § 1225(b)(2)(A) does not apply to noncitizens like Petitioners.

Finally, the government's previously unbroken 29-year streak of applying § 1226(a) as opposed to § 1225(b)(2)(A) to noncitizens like Petitioners is consequential. While courts exercise "independent judgment in determining the meaning of statutory provisions," "the longstanding practice of the government . . . can inform [a court's] determination of what the law

is." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386, 394 (2024) (quoting *NLRB v. Noel Canning*, 573 U.S. 513, 525 (2014)). As the government admits, the executive has never thought § 1225(b)(2)(A) to mean what the government now contends it means. Indeed, in March 1997, the government passed an interim rule which acknowledged that noncitizens "who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection)" are eligible for bond and that "inadmissible aliens, except for arriving aliens," can seek bond hearings before an immigration judge. Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures, 62 Fed. Reg. 10,312, 10,323 (Mar. 6, 1997). The government's almost three decades of practice "is powerful evidence that interpretating [§ 1225(b)(2)(A)] in [this] way is natural and reasonable." *Abramski v. United States*, 573 U.S. 169, 203 (2014) (Scalia, J., dissenting).

Though the text, canons, and past practice all support Petitioners' reading, the government raises several arguments to resist this conclusion. None is persuasive. First, the government contends that every "applicant for admission" is necessarily "seeking admission." To support this notion, it points to a sister provision in 8 U.S.C. § 1225(a)(3), which provides that "[a]ll aliens (including alien crewmen) who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers." 8 U.S.C. § 1225(a)(3). The government further contends that § 1225(a)(3)'s use of "otherwise" places "applicant for admission" within a subset of "aliens . . . seeking admission" such that an "applicant for admission" is always "seeking admission" into the United States. 25-1965 Respondent's Br., at 29.

This is not the most natural reading of § 1225(a)(3). To reach its conclusion, the government in effect employs the canon of *ejusdem generis*, meaning "a general or collective term at the end of a list of specific items is typically controlled and defined by reference to the specific classes that precede it." *Fischer v. United States*, 603 U.S. 480, 487 (2024) (quoting *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 458 (2022)) (citation modified). But this canon is appropriate when the word "otherwise" follows a list of specific terms. That is not the case in the instant appeal.

The cases the government cites belie its interpretation of "otherwise" in § 1225(a)(3).  In *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, the Supreme Court evaluated Congress's employ of "otherwise" in Section 804(a) of the Fair Housing Act.  576 U.S. 519, 533 (2015).  Section 804(a) provides that it shall be unlawful:

> To refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin.

*Id.* (quoting 42 U.S.C. § 3604(a)).  "Otherwise," as used in Section 804(a), was "[l]ocated at the end of lengthy sentences that begin with prohibitions on disparate treatment."  *Id.* at 534–35.  Thus, the Court concluded that "otherwise" "serve[d] as [a] catchall phrase[]" to the preceding enumerated list.  *Id.* at 535.  Section 1225(a)(3) contains no such list.

The government's citations to *Kleber v. CareFusion Corporation*, 914 F.3d 480 (7th Cir. 2019), *Villarreal v. R.J. Reynolds Tobacco Company*, 839 F.3d 958 (11th Cir. 2016) (en banc), and *Attorney General of the United States v. Wynn*, 104 F.4th 348 (D.C. Cir. 2024) fair no better.  *Kleber* and *Villarreal* involved interpretations of Section 4(a)(2) of the Age Discrimination in Employment Act, which provides that it shall be unlawful for an employer:

> to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age.

*Kleber*, 914 F.3d at 482 (quoting 29 U.S.C. § 623(a)(2)); *Villarreal*, 839 F.3d at 963 (same).  *Wynn* involved an interpretation of Section 618(f) of the Foreign Agents Registration Act, which authorized the government to apply for an injunction:

> Whenever . . . any person is engaged in or about to engage in any acts which constitute or will constitute a violation of any provision of this subchapter, or regulations issued thereunder, or whenever any agent of a foreign principal fails to comply with any of the provisions of this subchapter or the regulations issued thereunder, or otherwise is in violation of the subchapter[.]

104 F.4th at 353 (quoting 22 U.S.C. § 618(f)).

Each of these examples also involved an "otherwise" clause which immediately followed a list of examples.  *See, e.g.*, *Villarreal*, 839 F.3d at 963 (noting use of "'or otherwise' to join the

verbs in [§ 623(a)(2)]"); *Kleber*, 914 F.3d at 482–83 (same); *Wynn*, 104 F.4th at 354 (noting the "'otherwise' clause" followed "a list of . . . examples"). It thus made sense for our sister circuits to treat "otherwise" as a catch-all phrase that encompassed the enumerated list of examples which preceded it.

Comparatively, 8 U.S.C. § 1225(a)(3) employs a disjunctive phrase that lacks such a list of examples. "The phrase is disjunctive, with one specific and one general category, not . . . a list of specific items separated by commas and followed by a general or collective term. The absence of a list of specific items undercuts the inference embodied in *ejusdem generis* that Congress remained focused on the common attribute when it used the catchall phrase." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008). "Otherwise," as used in § 1225(a)(3), is better understood as "one of . . . several distinct and independent" qualifiers rather than "a general or collective term following a list of specific items to which a particular statutory command is applicable." *United States v. Aguilar*, 515 U.S. 593, 615 (1995) (Scalia, J., concurring in part and dissenting in part). Indeed, as the government admits, IIRIRA contemplates other situations where a non-applicant for admission may nevertheless be seeking admission. For example, lawful permanent residents who fall under any of 8 U.S.C. § 1101(a)(13)(C)'s scenarios or stowaways are not "applicants for admission" but may still "seek admission" in certain circumstances. *See* 8 U.S.C. §§ 1101(a)(13)(C), 1182(a)(6)(D), 1225(a)(2). Thus, we see no reason from § 1225(a)(3) to depart from the ordinary meaning of "seeking admission" in § 1225(b)(2)(A).

The dissent agrees that the canon of *ejusdem generis* does not support the government's § 1225(a)(3) argument. Nonetheless, it contends that the word "otherwise" "shows that being an 'applicant for admission' is one way of 'seeking admission.'" Dissent, at 43. To hold otherwise, the dissent claims, reads the word "otherwise" out of the text.

We disagree. To be sure, the dissent's approach is one way Congress may employ "otherwise" in a statute. *See Ali*, 552 U.S. at 226–27. But it is not the only way. The word "otherwise" can refine the subsection's scope as opposed to indicating relation between the two phrases. *See Inclusive Cmtys. Proj., Inc.*, 576 U.S. at 535 (noting how the use of the word "otherwise" in the statute "signal[ed] a shift in emphasis from an actor's intent to the

consequences of his actions"); *see also Hernandez Alvarez*, --- F.4th ---, 2026 WL 1243395, at *12 (noting how the phrase "can also refer to something that is different from something already mentioned" (internal quotation omitted)).   This understanding of the word "otherwise" is particularly appropriate where, as in § 1225(a)(3), the subsection shifts from the subject "applicant for admission" to the verbs "otherwise seeking admission," "otherwise . . . seeking readmission," and "otherwise . . . seeking transit."   8 U.S.C. § 1225(a)(3); *cf. United States v. Wilson*, 503 U.S. 329, 334 (1992) ("Congress' use of verb tense is significant in construing statutes.").  As we have discussed, and as the dissent and the government acknowledge, there are various instances wherein a noncitizen who is decidedly not an applicant for admission is still seeking admission.  *See* 8 U.S.C. § 1101(a)(13)(C) (describing instances where lawful permanent residents are seeking an admission into the United States); *id.* §§ 1182(a)(6)(D), 1225(a)(2) (stowaways).  Our reading of "otherwise" in § 1225(a)(3) firmly applies to such noncitizens.

Second, the government asserts that the ordinary meaning of "seeking admission" supports its view by employing the ordinary meaning of "apply" to define "seek."   The government derives this methodology from the phrase "applicant for admission."  Relatedly, the dissent eschews the relevant dictionary definitions of "seek" or "seeking" in favor of dictionary definitions of "applicant" and "apply."  Though the word "applicant" appears only as part of the term of art "applicant for admission" and the word "apply" appears nowhere in § 1225(b)(2)(A), the dissent still concludes from those words' ordinary meanings that every "applicant for admission" is an "alien seeking admission."  Dissent, at 33–36.

This approach is inapt.  "Although statutory language is generally to be given its natural or ordinary meaning, when a term is given a statutory definition or used as a term of art, that definition 'control[s] the meaning of statutory words in the usual case.'"   *Sanders v. Allison Engine Co.*, 703 F.3d 930, 938 (6th Cir. 2012) (quoting *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949)) (citation modified); *see Green*, 167 F.4th at 851–52.  Put differently, we do not "give the words of a statute their 'ordinary, contemporary, common meaning,'" if Congress indicates that it "intended them to bear some different import."  *Williams v. Taylor*, 529 U.S. 420, 431 (2000) (quoting *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 207 (1997)) (citation modified).  We therefore cannot do as the government and the dissent suggest

and break apart the statutorily defined term of art "applicant for admission" and distill the phrase's meaning from its individual parts.  As discussed, Congress defined "applicant for admission" in § 1225(a)(1) and that definition does not use the verb "apply."  8 U.S.C. § 1225(a)(1).  Rather, it requires only the presence of a noncitizen in the United States who either has not been admitted or who arrives in the United States.  *Id.*  The ordinary meanings of "apply" and "applicant" therefore have little application in light of Congress's provided definition.

The dissent resists this conclusion by asserting that Congress did not actually define the term of art "applicant for admission" in the INA.  Dissent, at 34.  According to the dissent, § 1225(a)(1) merely instructs that noncitizens present in the United States who have not been admitted or who arrives in the United States shall be treated as an applicant for admission.  The dissent also points to § 1225(a)(1)'s title, "Aliens treated as applicants for admission" and a dictionary definition of "as" to conclude that § 1225(a)(1) denotes only a non-exhaustive list of applicants for admission.

This is a distinction without a difference.  Section 1225(a)(1) sufficiently indicates Congress's intent for the phrase "applicant for admission" to bear a meaning different from any ordinary meaning.  *See Williams*, 529 U.S. at 431.  After all, § 1225(a)(1)'s designation that mere presence in the United States makes for an "applicant for admission" departs from the ordinary meaning of "applicant."  *See* Dissent, at 34.  The phrase itself thus evades ordinary understanding.  Indeed, even the BIA has noted how "Congress . . . defined the concept of an 'applicant for admission' in an unconventional sense."  *Matter of Miguel Lemus-Losa*, 25 I. & N. Dec. 734, 743 (BIA 2012).  Further, every one of our sister circuits that has considered whether § 1225(a)(1) supplied the definition for the phrase "applicant for admission" has answered that question in the affirmative.  *See Hernandez Alvarez*, --- F.4th ---, 2026 WL 1243395, at *6 ("Section 1225(a)(1) defines the term to mean "[a]n alien present in the United States who has not been admitted or who arrives in the United States.");  *Barbosa da Cunha*, --- F.4th ---, 2026 WL 1146044, at *5 (""[A]pplicant for admission' is defined by statute to mean any noncitizen who is present in the United States and has not been admitted, or is arriving in the United States.");  *Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048, 1061 (7th Cir. 2025)

("[Section] 1225(a)(1) defines an 'applicant for admission.'"); *Al Otro Lado v. Exec. Off. for Immigr. Rev.*, 138 F.4th 1102, 1118–19 (9th Cir. 2025) (same); *Scheerer v. U.S. Att'y Gen.*, 445 F.3d 1311, 1321 (11th Cir. 2006) ("The statute thus defines parolees as arriving aliens—i.e., applicants for admission[.]"); *see also Avila v. Bondi*, 170 F.4th at 1133 ("In defining ['applicant for admission'], § 1225(a)(1) reads as follows: An alien present in the United States who has not been admitted or who arrives in the United States . . . shall be deemed for purposes of this chapter an applicant for admission."); *Buenrostro-Mendez*, 166 F.4th at 499 ("Aliens who meet [§ 1225(a)(1)'s] statutory definition qualify as applicants for admission."). Accordingly, we reject the dissent's notion that Congress did not sufficiently indicate to us the obscure statutory meaning of "applicant for admission" such that we may then use ordinary meanings to determine its definition.

The government and the dissent also offer the analogy of a college or club applicant who is necessarily seeking admission to a college or club by virtue of their pending application. This analogy, however, has no purchase. A person is a college or club applicant because of a vital affirmative act—their submission of their application to the college or club. To ignore this important detail is like declaring that every single high school senior is an applicant to college because they are eligible to submit an application. But not every high school senior applies to college. Likewise, not every putative applicant for admission seeks admission.

Third, the government argues in the alternative that any noncitizen who attempts to remain in the United States after being arrested and detained by immigration officials is "seeking admission." We disagree. "[A] foreign national can be in lawful status but not admitted," such as individuals who receive asylum or temporary protected status. *Sanchez v. Mayorkas*, 593 U.S. 409, 415–16 (2021). Further, noncitizens who seek cancellation of removal, such as some of the Petitioners, are also not seeking admission since cancellation of removal does not confer admission into the United States. *See Matter of Y-N-P-*, 26 I. & N. Dec. 10, 13 (BIA 2012). So a noncitizen who seeks such immigration relief is not "seeking admission" under § 1225(b)(2)(A).

Even if Petitioners' desired immigration relief was a form of "seeking admission," the government's alternative argument would abut against § 1225(b)(2)(A)'s text. Section 1225(b)(2)(A) applies to applicants for admission only after "the *examining immigration officer*

determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A) (emphasis added). But for noncitizens like Petitioners who are within the interior, these claims for relief are typically presented before and resolved by an immigration judge, who is expressly not an immigration officer. *Compare* 8 U.S.C. § 1101(b)(4), *with* 8 U.S.C. § 1101(a)(18). Section 1225(b)(2)(A) would not apply to noncitizens in this alternative scenario.

The dissent further raises a number of arguments not countenanced by any of the parties or raised in the proceedings below. We address the arguments that relate to our understanding of § 1225(b)(2)(A). We do not, however, address the dissent's counterarguments directed at arguments unique to the Petitioners' briefs or unique to the Second Circuit's opinion in *Barbosa Da Cunha*, --- F.4th ---, 2026 WL 1146044. We thus do not address the dissent's counterarguments to Petitioners' claim that § 1225(b)(2)(A) applies only at the border or counterarguments relating to Petitioners' § 1226(c) arguments.

First, the dissent contends that our understanding of § 1225(b)(2)(A) leads to an incongruous reading between that provision and the humanitarian parole provision under 8 U.S.C. § 1182(d)(5)(A). Section 1182(d)(5)(A) permits the attorney general to temporarily parole into the United States any noncitizen "applying for admission" "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). In the dissent's view, our interpretation that "seeking admission" has meaning independent of "applying for admission" makes the humanitarian parole provision outside the reach of noncitizens like Petitioners.

We are unsure of the relevance of this argument. To the extent the dissent argues that our reading of "seeking admission" fails to construe these two provisions as a "harmonious whole," the dissent admits that the humanitarian parole statute still has force if it is applicable to noncitizens "applying for admission." Dissent, at 49 (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). Equally harmonious interpretations have little sway on our understanding of a provision. *See M.L. Johnson Fam. Props., LLC v. Bernhardt*, 924 F.3d 842, 852 (6th Cir. 2019). Thus, we disagree with the dissent that § 1182(d)(5)(A) demands that an "applicant for admission" necessarily must be "seeking admission."

Next, the dissent notes that 8 U.S.C. § 1101(a)(13)(C) enumerated certain instances where a lawful permanent resident ("LPR") is "seeking an admission into the United States." Dissent, at 49 (quoting 8 U.S.C. § 1101(a)(13)(C)).  One such example is § 1101(a)(13)(C)(vi), which states that an LPR "shall not be regarded as seeking an admission into the United States for purposes of the immigration laws unless the alien . . . has not been admitted to the United States after inspection and authorization by an immigration officer."    8 U.S.C. § 1101(a)(13)(C)(vi).  Thus, according to the dissent, Congress knew how to "sometimes treat[] present immigrants as 'seeking admission' even after an illegal entry."  Dissent, at 49.

We disagree with the dissent that this example illuminates its interpretation of "seeking admission."  LPRs stand far afield from Petitioners, who lack legal status.  Indeed, LPR status "carries several important privileges: [A noncitizen] may remain in the United States indefinitely; he is free to work in this country; he may return to this country after a temporary absence abroad; and he has the privilege of establishing a permanent residence in the United States."  *Saxbe v. Bustos*, 419 U.S. 65, 72 (1974).  The dissent perhaps seeks to import consistent usage of the phrases "seeking an admission" and "seeking admission" between § 1101(a)(13)(C)(iv) and § 1225(b)(2)(A).  "But 'the presumption of consistent usage readily yields to context,' and a statutory term may mean different things in different places.  That is particularly true when, as here, '[the INA] is far from a *chef d'oeurve* of legislative draftsmanship.'"  *See King v. Burwell*, 576 U.S. 473, 493 n.3 (2015) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014)) (internal citation omitted); *see also* Dissent, at 40 (noting IIRIRA's "'belt-and-suspenders' approach' to draftsmanship").    If anything, § 1101(a)(13)(C)'s discrete exceptions prove that Congress knew how to explicitly define certain LPRs present in the country as "seeking an admission" but chose not to do so for all other noncitizens who are also present in the country.

Finally, the dissent cites 8 U.S.C. § 1182(a)(9)(B)(i)(II) for the proposition that Congress intended the phrase "seeking admission" to include mere presence in the United States.  Section 1182(a)(9)(B)(i)(II) makes inadmissible "[a]ny alien (other than an alien lawfully admitted for permanent residence) who . . . has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or

removal from the United States."  8 U.S.C. § 1182(a)(9)(B)(i)(II).  The dissent adopts the BIA's reasoning in *Lemus-Losa* that the word "again" in the provision must mean that prior unlawful presence itself was a form of "seeking admission."  Dissent, at 50 (citing *Lemus-Losa*, 25 I. & N. Dec. 743 n.6).  Otherwise, according to the dissent, "the word 'again' in this provision would serve no purpose."  *Id.*

Again, we disagree.  The word "again" in the provision has force.  It limits the category of noncitizens who are deemed inadmissible in this provision to those who have sought admission or lawful entry in the past and are again seeking admission.  *Lemus-Losa* provides one such example: "in some cases . . . an alien will have reentered the United States unlawfully, thereby making himself an 'applicant for admission' by operation of law, while seeking 'admission' through adjustment of status."  25 I. & N. Dec. 744.  Thus, the further affirmative step of seeking admission renders such a noncitizen inadmissible under § 1182(a)(9)(B)(i)(II).

A throughline of the dissent's counterarguments is that its interpretation of "seeking admission" better serves Congress's intent to remedy the prior "anomaly" that a noncitizen stopped at the border had fewer procedural and substantive rights than a noncitizen who entered without inspection.  *See Hing Sum v. Holder*, 602 F.3d 1092, 1099–100 (9th Cir. 2010).  And, as the dissent correctly discusses, IIRIRA eliminated substantive and procedural incongruities between the two groups of noncitizens by replacing the previous "excludable" and "deportable" classification dichotomy with the current "inadmissible" and "deportable" regime.  *See* 8 U.S.C. §§ 1182, 1227; *see also Hernandez Alvarez*, --- F.4th ---, 2026 WL 1243395, at *19.  IIRIRA also labeled those who entered without inspection as "inadmissible" and placed a far greater burden onto them in removal proceedings than those noncitizens who were lawfully admitted but charged with a ground of deportability.  *See* 8 U.S.C. §§ 1182(a)(6)(A)(i), 1229a(c)(2), (c)(3)(A).

IIRIRA thus has already done much to address this anomaly.  But appealing to this congressional purpose can only go so far.  After all, "[i]t is 'quite mistaken to assume,' too, that any interpretation of a law that does more to advance a statute's putative goal 'must be the law.'  Laws are the product of 'compromise,' and no law 'pursues its . . . purpose[s] at all costs.'"  *Luna Perez*, 598 U.S. at 150 (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 89 (2017)) (internal citation omitted).  Both our and the dissent's view of "seeking admission"

preserve the "inadmissibility" disadvantage unadmitted noncitizens face in removal proceedings. *See* 8 U.S.C. § 1182(a)(6)(A)(i).  Noncitizens like Petitioners may still be detained pursuant to the strictures and procedures of § 1226(a).  And as we have discussed, there is very good reason to think that a rational Congress would have recognized the unavailability of detention space and thus not have wanted to subject millions of noncitizens in the interior to mandatory detention under § 1225(b)(2)(A).  We remain unpersuaded by the dissent's interpretation of "seeking admission."

We therefore find that an "applicant for admission" is not necessarily "seeking admission."  Because no Petitioner is alleged to be seeking admission or lawful entry into the United States, § 1225(b)(2)(A)'s mandatory detention scheme does not apply to them.  And since "§ 1226 applies to aliens already present in the United States" and "creates a default rule for those aliens by permitting—but not requiring—the Attorney General to issue warrants for their arrest and detention pending removal proceedings," Petitioners could have been detained pursuant to only § 1226.  *See Jennings*, 583 U.S. at 303.  The district courts therefore did not err when they held Petitioners' detentions under § 1225(b)(2)(A) to be unlawful.

### 3.  Petitioners' Claims Under the Fifth Amendment Due Process Clause

The Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  "[P]rocedural due process principles protect persons from deficient procedures that lead to the deprivation of cognizable liberty interests."  *Bartell v. Lohiser*, 215 F.3d 550, 557 (6th Cir. 2000) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333–34 (1976)).  "The hallmark of procedural due process is notice and an opportunity to be heard."  *United States v. Land Cont. Vendee's Int. in Real Prop. Located at 10616 Oakland Drive, Portage, Kalamazoo Cnty., Mich.*, 94 F.3d 645 (6th Cir. 1996) (unpublished table decision) (citing *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 313–14 (1950)).

Noncitizens who have "passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law."  *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953); *see also*

*Yamataya v. Fisher*, 189 U.S. 86, 100–01 (1903).  Thus, noncitizens within the interior of the United States are entitled to the protections of the Due Process Clause, "whether their presence here is lawful, unlawful, temporary, or permanent."  *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).  "It is well established that the Fifth Amendment entitles aliens to due process of law in [removal] proceedings."  *Reno v. Flores*, 507 U.S. 292, 306 (1993); *see also Demore v. Kim*, 538 U.S. 510, 523 (2003).  Consequently, the government may not deny "notice" or "an opportunity to be heard" to a noncitizen "who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population, although alleged to be illegally here."  *Yamataya*, 189 U.S. at 100–01.

To be sure, "[d]etention during removal proceedings is a constitutionally permissible part of that process."  *Demore*, 538 U.S. at 531.  But the government's ability to detain noncitizens is not limitless.  It should effectuate two regulatory goals: (1) ensuring the appearance of noncitizens at future immigration proceedings and (2) preventing danger to the community.  *See Zadvydas*, 533 U.S. at 690.  After all, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process Clause] protects."  *Id.*; *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004).  Where immigration detention becomes needlessly prolonged and appears to no longer effectuate the regulatory goals of civil immigration detention, courts routinely hold that the Due Process Clause requires an individualized bond hearing to justify a noncitizen's continued detention.  *See Hernandez-Lara v. Lyons*, 10 F.4th 19, 45–46 (1st Cir. 2021) (ordering new individualized bond hearing for petitioner detained under § 1226(a)); *Velasco Lopez v. Decker*, 978 F.3d 842, 855 & n.13 (2d Cir. 2020) (finding petitioner's detention under § 1226(a) without any individualized bond hearing violated due process); *cf. German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 213 (3d Cir. 2020) (holding "that once detention under § 1226(c) has become unreasonable, the Government must put forth clear and convincing evidence that continued detention is necessary"); *Zadvydas*, 533 U.S. at 701 ("[A noncitizen] may be held in confinement

[pending removal] until it has been determined that there is no significant likelihood of removal in the reasonably foreseeable future.").[3]

Petitioners have "passed through our gates" and are therefore protected by the Fifth Amendment's Due Process Clause. *See Mezei*, 345 U.S. at 212. The government contends, however, that Petitioners received too much process when the district courts determined that Petitioners were entitled to an initial individualized bond hearing while detained pursuant to § 1226(a). Resisting over a century of precedent, the government raises two ultimately unpersuasive arguments.

First, the government claims that the district courts' due process holdings are entirely derivative of their statutory interpretation holdings. But the government mischaracterizes the basis of Petitioners' due process claims. To be sure, Petitioners did raise their due process claims on statutory grounds. But Petitioners undoubtably also argued that their detention without bond deprived them of their liberty without due process of law.

Next, the government claims that *Department of Homeland Security v. Thuraissigiam*, 591 U.S. 103 (2020) and *Demore* ameliorate Petitioners' due process concerns. In particular, the government avers that *Thuraissigiam* explained that noncitizens in removal proceedings are afforded only the process that is coextensive with the procedures provided by Congress and that *Demore* generally held that statutory provisions denying bond during administrative removal proceedings do not violate the Due Process Clause.

The government stretches the Supreme Court's holdings in *Thuraissigiam* and *Demore* beyond their logical breaking points. The *Thuraissigiam* Court stated that a noncitizen "in respondent's position has only those rights regarding admission that Congress has provided by statute." 591 U.S. at 140. But this holding is clearly limited to noncitizens at the border: *Thuraissigiam* involved the "due process rights of an alien *seeking initial entry*[,]" and the Supreme Court expressly constrained *Thurassigiam*'s holding to noncitizens "in respondent's

---

[3] Indeed, detention pending removal proceedings can become unduly prolonged and indefinite because it can take months or even years for the removal proceedings to resolve. *See Hernandez-Lara*, 10 F.4th at 26 (10 months in detention); *Velasco Lopez*, 978 F.3d at 855 (15 months in detention); *German Santos*, 965 F.3d at 212 (2.5 years in detention).

position." *Id.* at 139–40 (emphasis added). Further, the respondent in *Thuraissigiam* was stopped and detained within only 25 yards of the border shortly after crossing it, *id.* at 114, whereas Petitioners have resided within the United States for years. *Thuraissigiam* merely reinforces our longstanding understanding that noncitizens "on the threshold of initial entry stand[] on a different footing" than those who have "passed through our gates." *Mezei*, 345 U.S. at 212. It does not control where, like in the instant case, noncitizens have resided within the United States for years.

The government's interpretation of *Demore* is also not supportable. The *Demore* Court concluded that mandatory detention under § 1226(c) without an initial individualized bond determination did not violate a noncitizen's procedural due process rights. 538 U.S. at 531. Crucially, *Demore* did not address the process due to noncitizens subject to § 1226(a)'s permissive detention scheme. *See id.* at 517–31. The *Demore* Court also relied on Congress's finding that "permitting discretionary release of aliens pending their removal hearings would lead to large numbers of deportable criminal aliens skipping their hearings and remaining at large in the United States unlawfully." *Id.* at 528. Initial mandatory detention without bond under § 1226(c) thus worked to mitigate this risk. But Congress made no such finding as to noncitizens detained under § 1226(a). Indeed, § 1226(a)'s role as the "default rule" to § 1226(c)'s enumerated exceptions signals the subsection's different purpose within IIRIRA's statutory scheme. *See Jennings*, 583 U.S. at 288. Thus, we decline the government's invitation to extend *Demore* to the district courts' § 1226(a) due process holdings.

Though the dissent addresses Petitioners' due process arguments in the context of detention under § 1225(b)(2)(A), it raises an argument which abuts against our analysis here and warrants a response. The dissent asserts that "[n]on-citizen immigrants do not have a due-process 'liberty' interest (or private right) to *enter* the United States or continue to *reside* in the country after entering it." Dissent, at 59 (emphasis in original). This misses the mark. Petitioners are not claiming deprivations of those liberty interests. Rather, Petitioners rightfully state that they have a liberty interest to be free from detention. As discussed, this is the most fundamental interest protected by the Due Process Clause and is shared by citizens and noncitizens alike. *See Zadvydas*, 533 U.S. at 690; *Hamdi*, 542 U.S. at 529. It is from this liberty

interest that detention without an individualized bond hearing can become constitutionally impermissible, even if the detention has a theoretical end point. *See Hernandez-Lara*, 10 F.4th at 45–46; *Velasco Lopez v. Decker*, 978 F.3d at 855 & n.13.

The district courts determined that the government's detention of Petitioners without bond under § 1226(a) was a deprivation of liberty that violated Petitioners' due process rights. We find no error in the district courts' conclusions that Petitioners were due individualized bond hearings in light of the significant time they have spent within the interior of the United States. We therefore find no reason to disturb the district courts' due process holdings.

### III.  CONCLUSION

Petitioners are more than just names on a pleading.  Petitioners have lived in the United States for years or decades.  Some, such as Juan Lopez-Campos or Fredy De Los Angeles-Flores, own property or work for locally owned businesses.  Others, such as Jairo Manuel Godoy-Perez, have worked with law enforcement to facilitate criminal prosecutions.  All appear to contribute to their neighborhoods and local communities.  Many are the primary breadwinners or essential caregivers for their families, which include their children who were born here and are citizens of the United States.

Though the government has now released Petitioners from detention, our understanding of § 1225(b)(2)(A)'s scope ensures that noncitizens like Petitioners should have a forum to explain that their backgrounds and connections to their communities justify release on bond while they undergo their removal proceedings.  To hold otherwise would subject long-term law-abiding residents in the United States, such as Petitioners, to the hardship of mandatory detention without due process.

For the reasons set forth above, we **AFFIRM** the judgments of the district courts in case Nos. 25-1965; 25-1969; 25-1978; 25-1982.

———————————

**DISSENT**

———————————

MURPHY, Circuit Judge, dissenting.  Our country's immigration laws once encouraged illegal behavior.  If immigrants *lawfully* stopped for an inspection at our border, the Immigration and Nationality Act (INA) required the government to detain them pending a hearing on their right to be here.  But if immigrants *unlawfully* snuck across the border, they could get released on bond pending such a hearing.  In 1996, Congress eliminated this discrepancy.  It told courts that they must treat *both* arriving immigrants at the border *and* present immigrants who entered illegally as "applicant[s] for admission" under the INA.  8 U.S.C. § 1225(a)(1).  And it told immigration officers to detain all "applicant[s] for admission" who are "seeking admission" pending their removal proceedings unless they are "clearly" entitled to admission.  *Id.* § 1225(b)(2)(A).

The dozens of habeas petitioners in these consolidated appeals (whom I will refer to as the "Petitioners") are present in the United States after an illegal entry.  Relying on § 1225(b)(2)(A)'s detention mandate, the Department of Homeland Security (DHS) detained them pending their removal proceedings.  But they sought habeas relief on the ground that DHS should have detained them under a separate INA provision that allows them to seek release on bond.  The district courts agreed and ordered DHS to release the Petitioners or give them a bond hearing.  I would reverse.

The INA's text, structure, and history show that the government must detain the Petitioners under § 1225(b)(2)(A) because they are "applicants for admission" who are "seeking admission."  All agree that the Petitioners are "applicants for admission."  Yet several circuit courts have now disagreed on whether immigrants in their position are also "seeking admission." In my view, the key dividing line between these courts turns on what the INA means when it says that an immigrant present in this country without having been admitted "shall be deemed for purposes of this chapter an applicant for admission."  *Id.* § 1225(a)(1). The Second and Eleventh Circuits have narrowly read this text as a statutory definition of "applicant for admission" that

affects only that one phrase. *See Hernandez Alvarez v. Warden*, __ F.4th __, 2026 WL 1243395, at *5–21 (11th Cir. May 6, 2026); *Cunha v. Freden*, __ F.4th __, 2026 WL 1146044, at *5–9 (2d Cir. Apr. 28, 2026). But the Fifth and Eighth Circuits have broadly read this text as requiring courts to treat immigrants deemed "applicants for admission" to be engaging in the conduct that an ordinary person would say applicants undertake: "applying for" or "seeking" admission. *See Avila v. Bondi*, 170 F.4th 1128, 1133–38 (8th Cir. 2026); *Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 502–08 (5th Cir. 2026).

I side with the Fifth and Eighth Circuits. If Congress had wanted to draft a definition of the phrase "applicant for admission," it could have identified what this phrase *means* in the INA's definitions section. *See* 8 U.S.C. § 1101. But Congress instead told courts to *treat* an immigrant who is present in this country without admission as an "applicant for admission" "for purposes of" the entire INA. *Id.* § 1225(a)(1). Under basic interpretive rules, we must give the undefined word "applicant" its ordinary meaning: one who applies for or seeks. We thus must regard the Petitioners as "applying for" or "seeking" admission when we see phrases like "alien applying for admission" or "alien seeking admission" in the INA—including in § 1225(b)(2)(A)'s detention provision.

The INA's structure and history confirm this view. If, as the Petitioners claim, Congress sought to limit detention to immigrants who are "arriving in the United States," it would have used that phrase in § 1225(b)(2)(A)—just as it did in countless other places. Indeed, this provision once required the detention of immigrants "who may not appear to the examining immigration officer *at the port of arrival* to be clearly and beyond a doubt entitled *to land*[.]" 8 U.S.C. § 1225(b) (1994) (emphases added). Why wouldn't Congress have used similar language if it had meant to continue to limit detention to arriving immigrants? Congress also used phrases like "seeking admission" or "applying for admission" in other places—all of which are best read to cover immigrants deemed "applicants for admission." And while the Second Circuit now takes the contrary view, it once said that immigrants like the Petitioners qualify as "alien[s] applying for admission" eligible for humanitarian parole "by virtue of their status as applicants for admission." *Cruz-Miguel v. Holder*, 650 F.3d 189, 197–98 (2d Cir. 2011) (quoting 8 U.S.C. § 1182(d)(5)(A)). So that court's recent *Cunha* decision conflicts with this earlier

precedent.  Yet courts should strive to read the statute in a neutral way by taking the same approach for the mandatory-detention provision that they take for the humanitarian-parole provision.  Because my colleagues nevertheless follow the views of the Second and Eleventh Circuits, I respectfully dissent.

## I. Statutory Backdrop

To determine the detention provision that applies to the Petitioners, I find it helpful to start with a bird's eye view of the INA.  Before 1996, this law distinguished between immigrants who presented themselves at the border and immigrants who snuck into the country.  Immigrants in the former group ("excludable aliens") would trigger *exclusion* proceedings.  8 U.S.C. §§ 1182(a), 1225–26 (1994).  Immigrants in the latter group ("deportable aliens") would trigger *deportation* proceedings.  *Id.* §§ 1251(a)(1)(B), 1252 (1994); *see Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 159, 175 (1993); *Cruz-Miguel*, 650 F.3d at 196–97.

Start with immigrants arriving at the border.  The pre-1996 law told "immigration officers" to conduct "[t]he inspection" "of aliens . . . seeking admission or readmission to or the privilege of passing through the United States[.]"  8 U.S.C. § 1225(a) (1994).  It added that those officers shall "examine[]" "[a]ll aliens arriving at ports of the United States[.]"  *Id.*  If an "examining officer at the port of arrival" found that an immigrant was not "clearly and beyond a doubt entitled to land," the immigrant had to "be detained" pending exclusion proceedings.  *Id.* § 1225(b) (1994).  (Congress slightly adjusted this subsection in early 1996 to require detention during exclusion proceedings "if the examining immigration officer determine[d] that an alien seeking entry [was] not clearly and beyond a doubt entitled to enter[.]"  Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, § 422(a), 110 Stat. 1214, 1271.)  During the exclusion proceedings, a "special inquiry officer" would decide whether "an arriving alien who ha[d] been detained" under § 1225 "shall be allowed to enter or shall be excluded and deported."  8 U.S.C. § 1226(a) (1994).  That said, the Attorney General could temporarily "parole into the United States" "any alien applying for admission" who met certain criteria.  *Id.* § 1182(d)(5)(A) (1994).

Turn to immigrants illegally present in the country.  The INA did not require officers to inspect this group.  It did, however, treat "[a]ny alien who entered the United States without inspection" as "deportable."  *Id.* § 1251(a)(1)(B) (1994).  The law subjected these "deportable aliens" to deportation proceedings.  *Id.* § 1251(a) (1994).  It allowed the Attorney General to arrest "any alien" during these proceedings.  *Id.* § 1252(a)(1) (1994).  Subject to the Attorney General's "discretion," though, immigrants who fell within this class could "be released under bond" or "conditional parole" pending the completion of the proceedings.  *Id.*

Before 1996, the INA relied on the word "entry" to distinguish between excludable and deportable immigrants.  Immigrants who had not entered were subject to exclusion proceedings while those who had were subject to deportation proceedings.  *See* Charles Gordon, Stanley Mailman & Stephen Yale-Loehr, 1 *Immigration Law and Procedure* § 1.03(2)(b) (2025).  The law defined "entry" to include any lawful or unlawful "coming of an alien into the United States[.]"  8 U.S.C. § 1101(a)(13) (1994).  But the Supreme Court read this definition in a unique way.  It "treated" immigrants who arrived at a port and were detained (or paroled) as if they had been "stopped at the border" even though they had actually entered the country.  *DHS v. Thuraissigiam*, 591 U.S. 103, 139 (2020) (citation omitted); *Leng May Ma v. Barber*, 357 U.S. 185, 188–90 (1958).

This distinction created an "anomaly."  *Hing Sum v. Holder*, 602 F.3d 1092, 1100 (9th Cir. 2010).  Immigrants who lawfully "presented themselves at a port of entry" had fewer "procedural and substantive rights" than those who unlawfully snuck in.  *Id.*  Of most note for present purposes, immigrants who evaded detection could seek release on bond while those who presented themselves at the border faced mandatory detention.  *See Buenrostro-Mendez*, 166 F.4th at 498.

In 1996, Congress sought to eliminate the differential treatment in the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA).  Pub. L. 104-208, 110 Stat. 3009-546 (1996).  IIRIRA changed the law in two important ways.  It first reduced the emphasis on an old term ("entry") in favor of a new one ("admission").  The INA now defines "admission" and "admitted" as "the *lawful* entry of the alien into the United States after inspection and authorization by an immigration officer."  8 U.S.C. § 1101(a)(13)(A) (emphasis added).  IIRIRA

next jettisoned an old phrase ("excludable aliens") in favor of a new one ("[i]nadmissible aliens"). *Id.* § 1182. Several categories of "inadmissible aliens" are "ineligible to be admitted to the United States[.]" *Id.* § 1182(a). The INA now treats immigrants who illegally sneak into the country as *inadmissible* even though the pre-1996 law would have treated them as *deportable*: "An alien present in the United States without being admitted or paroled . . . is inadmissible." *Id.* § 1182(a)(6)(A)(i). On the other hand, immigrants who lawfully enter but become removable later (say, because they overstay their visa) remain in the group of "deportable aliens." *Id.* § 1227.

Apart from these substantive changes, IIRIRA consolidated exclusion and deportation proceedings into generic "[r]emoval proceedings" that address "the *inadmissibility* or *deportability* of an alien." *Id.* § 1229a(a)(1) (emphases added). But this law sets different burdens of proof for "inadmissible aliens" as compared to "deportable" ones. If the government charges "applicant[s] for admission" with being inadmissible, the applicants must prove that they are "clearly and beyond doubt entitled to be admitted and [are] not inadmissible under section 1182[.]" *Id.* § 1229a(c)(2)(A). IIRIRA tells us to treat both immigrants "who arrive[] in the United States" at the border and those who are "present" without having "been admitted" as "applicant[s] for admission" under the INA. *Id.* § 1225(a)(1). If, by contrast, the government charges "admitted" immigrants with being deportable, it retains "the burden of establishing by clear and convincing evidence that" they are, in fact, "deportable." *Id.* § 1229a(c)(3)(A).

This general statutory history brings me to the two provisions of the current INA that matter the most in these appeals: § 1225 (which, in some respects, resembles the pre-1996 §§ 1225 and 1226) and § 1226 (which, in some respects, resembles the pre-1996 § 1252).

*Section 1225*. Section 1225 governs the inspection and detention of any "applicant for admission" (which, again, includes not just immigrants *arriving* at the border but also *present* immigrants who illegally entered). *See id.* § 1225(a)(1). Subsection (a) requires immigration officers to inspect these "applicants": "All aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States shall be inspected by immigration officers." *Id.* § 1225(a)(3). Subsection (b) establishes two methods of inspection—in paragraphs (b)(1) and (b)(2)—depending on the type of applicant.

Begin with § 1225(b)(1).  This paragraph creates an "expedited removal" process for a subset of applicants (unless they assert credible asylum claims).  *Thuraissigiam*, 591 U.S. at 109.  The paragraph first covers immigrants *arriving* at the border who are inadmissible due to fraud or a lack of valid documentation.  8 U.S.C. § 1225(b)(1)(A)(i) (citing *id.* § 1182(a)(6)(C), (a)(7)).  It then allows the Executive Branch to apply this expedited process to *non-arriving* immigrants who have been "physically present" in this country for less than two years.  *Id.* § 1225(b)(1)(A)(iii).  The government must detain all immigrants who fall within this paragraph pending their removal or a review of their asylum claim.  *See id.* § 1225(b)(1)(B)(ii), (iii)(IV).

Next up is § 1225(b)(2).  This paragraph is entitled "Inspection of other aliens."  *Id.*  It states that, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for" removal proceedings under § 1229a.  *Id.* § 1225(b)(2)(A).  The mandatory "shall" shows that these immigrants cannot seek release on bond or conditional parole pending their removal proceedings.  Still, the Secretary of Homeland Security retains the pre-1996 authority to "temporarily" "parole" "any alien applying for admission to the United States" for "urgent humanitarian reasons or significant public benefit[.]" *Id.* § 1182(d)(5)(A).

*Section 1226*.  Section 1226, by comparison, allows the Attorney General to arrest and detain any immigrant subject to removal proceedings: "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."  *Id.* § 1226(a).  It thus covers, for example, admitted immigrants who have become "deportable" for a reason listed in § 1227.  *See Jennings v. Rodriguez*, 583 U.S. 281, 288 (2018).  Like the pre-1996 law, though, § 1226 still gives the Attorney General discretion to "release the alien on" "bond" or "conditional parole[.]"  8 U.S.C. § 1226(a)(2).

Yet § 1226 does not make *all* immigrants eligible for release.  Rather, the Attorney General "shall take into custody any alien who" has committed certain crimes.  *Id.* § 1226(c)(1)(A)–(E).  And Congress recently expanded § 1226(c)'s scope in the Laken Riley Act. Pub. L. No. 119-1, § 2, 139 Stat. 3 (2025).  So while § 1226(a) generally permits bond,

immigrants subject to § 1226(c) do not qualify for this benefit.  And the Attorney General must start removal proceedings against convicted criminals "as expeditiously as possible[.]"  8 U.S.C. § 1229(d)(1).

For decades, the Executive Branch did not treat immigrants who snuck into the country and were present here unlawfully as subject to mandatory detention under § 1225(b)(2)(A) during their removal proceedings.  It instead treated them as eligible for release on bond or conditional parole under § 1226(a).  *See* 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997).  Yet the Executive Branch never issued formal guidance defending this position.  *See id.*

In July 2025, the Executive Branch departed from its unreasoned view.  DHS decided that it must detain immigrants who are in this country after an unlawful entry under § 1225(b)(2)(A).  The Board of Immigration Appeals later endorsed this view.  *Matter of Yajure Hurtado*, 29 I. & N. Dec. 216, 220 (BIA 2025).  As a result, unadmitted immigrants like the Petitioners may not get released on bond under § 1226(a) despite their lengthy (illegal) residency here.

## II. Statutory Question: Does § 1225(b)(2)(A) Apply to the Petitioners?

This statutory backdrop clarifies the question presented: Does § 1225(b)(2)(A) compel the government to detain immigrants (like the Petitioners) who are present in this country after an illegal entry?  In my view, statutory text, structure, and history all favor the government's reading that § 1225(b)(2)(A) reaches this group.  Unlike my colleagues, then, I would follow the approach of the Fifth and Eighth Circuits rather than that of the Second and Eleventh Circuits. *See Avila*, 170 F.4th at 1133–38; *Buenrostro-Mendez*, 166 F.4th at 502–08.

### A. Text of § 1225(b)(2)(A)

When interpreting a statute, we, of course, must "start with" its language.  *Campos-Chaves v. Garland*, 602 U.S. 447, 457 (2024).  So it is worth quoting the key language in full: "Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under

§ 1229a of this title."  8 U.S.C. § 1225(b)(2)(A).  As District Judge Cole explained, immigrants who evaded inspection and who are illegally present in the country satisfy every part of this text. *See Coronado v. Sec'y, Dep't of Homeland Sec.*, 2025 WL 3628229, at *7–8 (S.D. Ohio Dec. 15, 2025).

### 1. The Petitioners Meet Every Requirement of § 1225(b)(2)(A).

Consider § 1225(b)(2)(A)'s parts in turn.  *First*, can the Petitioners avoid detention under § 1225(b)(2)(A) because they are "[s]ubject to subparagraphs (B) and (C)"?   8 U.S.C. § 1225(b)(2)(A).  The answer is an undisputed no.  Subparagraph (B) exempts "a crewman," an immigrant subject to expedited removal under § 1225(b)(1), and "a stowaway" from that detention.  *Id.* § 1225(b)(2)(B).  And subparagraph (C) allows the Attorney General to "return" some arriving immigrants to the "foreign territory" from which they came (in lieu of detention) during their removal proceedings.  *Id.* § 1225(b)(2)(C).  Yet no Petitioner falls within subparagraph (B), and the government did not invoke subparagraph (C).

*Second*, is each Petitioner "an alien who is an applicant for admission"?  *Id.* § 1225(b)(2)(A).  The answer is an undisputed yes.  Section 1225(a)(1) "deem[s]" an "alien *present in the United States who has not been admitted*" as an "applicant for admission" "for purposes of" the INA.  *Id.* (emphasis added).  The INA defines "admitted" as the "lawful entry of the alien into the United States after inspection and authorization by an immigration officer."  *Id.* § 1101(a)(13)(A).  Putting these two provisions together, the INA treats immigrants present in this country after an unlawful entry as applicants for admission.  All the Petitioners fall into that group.

*Third*, has an "examining immigration officer determine[d] that" the Petitioners are "not clearly and beyond a doubt entitled to be admitted"?  *Id.* § 1225(b)(2)(A).  The answer is again an undisputed yes.  Officers made this decision when issuing the Petitioners a "notice to appear" under § 1229(a)(1), which initiated their removal proceedings under § 1229a.  Consider one of the Petitioners: Juan Manuel Lopez-Campos.  After local police stopped him for a traffic violation, they contacted border patrol.  An immigration officer then issued him a notice to appear that charged him with inadmissibility.  The Petitioners also cannot claim an entitlement

"to be admitted," *id.* § 1225(b)(2)(A), because their primary interpretive theory depends on their being "present in the United States without being admitted or paroled," *id.* § 1182(a)(6)(A)(i).

*Fourth*, recall that, "in the case of an alien who is an applicant for admission," immigration officers must detain an "alien *seeking admission*" who is not entitled to admission. *Id.* § 1225(b)(2)(A) (emphasis added). Were the Petitioners "seeking admission" when officers inspected them? The parties dispute only this last question. According to the government, we must interpret that phrase in harmony with the statutory designation treating the Petitioners as "applicants for admission." And it says that an applicant for something naturally "seeks" that thing. According to the Petitioners, we should ignore this term-of-art statutory *designation* in favor of the term-of-art statutory *definition* of "admission." They say the phrase "seeking admission" requires us to ask on an applicant-by-applicant basis whether an applicant requests a "lawful entry" at the time of an inspection. Appellee's Br. 29–30 (quoting 8 U.S.C. § 1101(a)(13)(A)). (All cites to the briefing refer to *Lopez-Campos v. Raycraft*, 25-1965.) If an applicant for admission does not request a lawful entry, the Petitioners would find that the applicant is not "seeking admission."

In my view, the government's reading better respects the text. Of most note, IIRIRA conveys that the Petitioners are "applicants for admission" in a unique way. The statutory designation in § 1225(a)(1) does not say that the phrase "applicant for admission" *means* the two groups of immigrants that it lists: those who are "present in the United States who ha[ve] not been admitted" and those "who arrive[] in the United States[.]" 8 U.S.C. § 1225(a)(1). Rather, this designation says that an immigrant in either group "*shall be deemed for purposes of this chapter* an applicant for admission." *Id.* (emphasis added). Section § 1225(a)(1)'s title conveys the same: "Aliens *treated* as applicants for admission." *Id.* (emphasis added). In other words, § 1225(a)(1) conveys that—whatever the word "applicant" means—the two identified groups of immigrants fall within this word. Courts thus must "regard" the Petitioners "as" (or "consider" them) applicants for admission. *American Heritage Dictionary of the English Language* 487 (3d ed. 1992) (defining "deem"); *see Black's Law Dictionary* 425 (7th ed. 1999). And we must treat them in this designated way "for purposes of" every provision of the INA. 8 U.S.C. § 1225(a)(1).

The statute, though, does not define the word "applicant." Indeed, nothing in § 1225(a)(1) prevents other unidentified immigrants from qualifying as "applicants" for admission too. The INA thus still requires us to figure out what this word means. Because IIRIRA does not define it, we must give the word its "ordinary meaning" under basic interpretive principles. *EPA v. Calumet Shreveport Refin., L.L.C.*, 145 S. Ct. 1735, 1747 (2025). In that respect, an "applicant" for admission is "[o]ne who applies" for admission. 1 *Oxford English Dictionary* 575 (2d ed. 1989). To "apply" for admission, in turn, means to "seek . . . admission." *American Heritage*, *supra*, at 89. That is how any average person would understand the word. Imagine if a high-school student applied to attend a university or a carpenter applied to work for a construction firm. Nobody would dispute that the student and the carpenter were applicants for admission or employment. And it would make no sense to say that they were not "seeking" admission or employment. I would follow the same common-sense definition here. So if we combine the ordinary meaning of the words "deemed" and "applicant" in § 1225(a)(1), this provision tells us to "regard" the Petitioners "as" immigrants who are "seek[ing]" or "apply[ing]" for admission. *Id.* at 89, 487.

Now incorporate this understanding of § 1225(a)(1)'s statutory designation into the mandatory-detention provision. It says, "in the case of an alien who is an applicant for admission," an examining immigration officer must detain "an alien seeking admission" who is not clearly entitled to be admitted pending removal proceedings. 8 U.S.C. § 1225(b)(2)(A). Because we must "regard" the Petitioners "as" "seek[ing] . . . admission" under the ordinary meaning of "applicant," *American Heritage*, *supra*, at 89, 487, we must regard them as "seeking admission" under § 1225(b)(2)(A)'s additional language. In other words, by "deem[ing]" certain immigrants to be "applicant[s] for admission" under the INA, 8 U.S.C. § 1225(a)(1), the law commands us to treat them as if they were applying for (or seeking) admission wherever the INA uses those phrases—whether or not they "*actually*" are doing so, *Matter of Lemus-Losa*, 25 I. & N. Dec. 734, 743 (BIA 2012). In short, I would not treat unadmitted immigrants who entered unlawfully as "applicants for admission" *exclusively for that phrase*. Rather, as the Board stated in another context, I would respect Congress's "term of art" designation in § 1225(a)(1) when interpreting the *rest of the INA* (including phrases like "applying for admission" or "seeking admission"). *Id.* at 743 n.6.

But doesn't this create a redundancy?  The detention provision essentially reads: "in the case of an alien who is [applying for admission]," an immigration officer must detain "an alien seeking admission" who is not clearly entitled to admission.  8 U.S.C. § 1225(b)(2)(A).  Yet we can give both "applicant for admission" and "seeking admission" separate meaning if we consider an ordinary grammar rule and a nearby subsection.  Start with grammar: the detention provision uses the verb "seek" with an "-ing" ending in an adjectival participle clause that modifies "alien."  *See The Chicago Manual of Style* ¶¶ 5.114–.115, at 273–74 (18th ed. 2024).  An applicant's effort to seek admission thus must be "in progress . . . at the time" the mandatory-detention provision makes relevant.  *Id.* ¶ 5.114, at 274.  And Congress tied this provision to the time that an immigration officer *inspects* an applicant.  *See* 8 U.S.C. § 1225(b)(2)(A).  In most cases, this timing issue will not make a difference because the statutory designation treats unadmitted "alien[s] *present* in the United States" as "applicant[s] for admission"—meaning that they remain applicants as long as they stay in this country (including at the time of their inspection).  *Id.* § 1225(a)(1) (emphasis added).  In effect, their presence represents a constructive application for admission.

That is where the nearby subsection comes in.  It says: "An alien applying for admission may, in the discretion of the Attorney General and at any time, be permitted to *withdraw* the application for admission and *depart* immediately from the United States."  *Id.* § 1225(a)(4) (emphases added).  So immigrants who are here after illegally entering but who seek to "withdraw" their constructive applications by requesting to "depart" at the time of the inspection would qualify as "applicants for admission" who are not "seeking admission" *at that time.*  *Id.* Just the opposite: they are seeking to withdraw their applications by departing.  The "seeking admission" phrase clarifies that the government need not detain and start removal proceedings against this group.

At the same time, this limit on the "applicants for admission" who are "seeking admission" does not help the Petitioners.  They did not try to withdraw their applications and depart the country during their inspections.  Rather, they are all "try[ing]" or "request[ing]" to remain in the country, so they have sought to proceed through removal proceedings.  14 *Oxford English Dictionary*, *supra*, at 877.  As a result, the Petitioners were applicants for admission who

sought admission when immigration officers inspected them.  And § 1225(b)(2)(A) requires their detention.

2. The Petitioners' Contrary Reading Disregards § 1225(a)(1)'s Statutory Designation.

The Petitioners (along with my colleagues in the majority and the Second and Eleventh Circuits) offer two theories to justify their contrary view of the phrase "seeking admission." They rely on both the statutory definition of "admission" and the rule against superfluity.

*Statutory "Admission" Definition*.  The Petitioners first invoke the statutory definition of "admission."  Recall that the INA defines "admission" and "admitted" as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A).  The Petitioners point out that, when immigration officers inspected them, they had been present in the country for years.  They allegedly could not have been "seeking" *lawful* entry (the definition of "admission") at this time because they had *unlawfully* entered years ago.  Appellee's Br. 29–31; *see Cunha*, 2026 WL 1146044, at *6.  Because they could not *obtain* admission at that belated time, they say, how could they have been *seeking* it? My simple answer is that the statute tells us to treat them as if they were.  Indeed, the Petitioners' view flouts § 1225(a)(1)'s statutory designation.  Although IIRIRA makes them inadmissible, 8 U.S.C. § 1182(a)(6)(A)(i), it still requires us to adhere to the "legal fiction" that treats them as applicants for the admission that it does not allow them to receive, *Black's Law Dictionary*, *supra*, at 425; 8 U.S.C. § 1225(a)(1).  And an "applicant" for admission *applies for* or *seeks* that admission under the ordinary understanding of the word.  So it is beside the point that immigrants who are present in this country after an illegal entry (including the Petitioners) can no longer obtain an admission.

In response to this point, the Second Circuit asserted that we cannot follow the ordinary meaning of the word "applicant" because § 1225(a)(1) contains "an explicit definition" of the phrase "applicant for admission."  *Cunha*, 2026 WL 1146044, at *7.  That is, the Second Circuit treated § 1225(a)(1) as defining this phrase to *mean* only the two identified groups of immigrants: those "present in the United States who [have] not been admitted" and those "who arrive[] in the United States[.]"  8 U.S.C. § 1225(a)(1).  The Second Circuit then invoked the

(correct) proposition that courts must follow a statutory definition (rather than the ordinary one) when Congress defines a term.  *Cunha*, 2026 WL 1146044, at *7.  And it added that Congress did *not* define the phrases "applying for admission" or "seeking admission."  *See id.*  So it gave these phrases their ordinary meaning to exclude those (like the Petitioners) who do not request a lawful entry.  *See id.*

I disagree with this approach because one cannot read § 1225(a)(1)'s language as a *definition* of the phrase "applicant for admission."  The INA has a lengthy "[d]efinitions" section that tells us what many words in the law "mean," including, for example, the words "admission" and "admitted."  8 U.S.C. § 1101(a)(13)(A).  But Congress did not define "applicant for admission" in § 1101.  Nor does § 1225(a)(1) define the phrase.  It instead says that we must "deem" the two identified groups of immigrants as applicants for admission.  *Cunha*, 2026 WL 1146044, at *7.  Because the paragraph nowhere defines the word "applicant," it is inevitable that courts must give *some* definition to this word.  And I would use its ordinary meaning when applying the law.  *See Hernandez Alvarez*, 2026 WL 1243395, at *24–25 (Lagoa, J., dissenting).

My view is confirmed by the Second Circuit's treatment of the withdrawal provision in § 1225(a)(4).  This provision notes that "[a]n alien *applying for admission* may . . . be permitted to withdraw the application for admission and depart immediately from the United States."  8 U.S.C. § 1225(a)(4) (emphasis added).  The Second Circuit held that this provision does not cover immigrants present in this country after an illegal entry because they are not "applying for admission" under the ordinary meaning of that phrase.  *See Cunha*, 2026 WL 1146044, at *10–11.  According to that court, Congress told us to treat certain immigrants as "applicants for admission" in one paragraph (§ 1225(a)(1)) but then expected us to *not* treat those immigrants as "applying for admission" just three paragraphs later (§ 1225(a)(4)).  That reading strikes me as incoherent.  How can an immigrant who is statutorily treated as an applicant not also be treated as applying?  Nor is the Second Circuit right to treat immigrants who are present in this country as *past* applicants for admission.  *See id.* at *10.  To the contrary, they remain applicants as long as they are "present," so we must treat their constructive applications as *pending* at the time of their inspections.  8 U.S.C. § 1225(a)(1).  And like immigrants at the border, they should have

the right to request to "depart" at that time (and "withdraw" their constructive applications) rather than proceed through removal proceedings. *Id.* § 1225(a)(4).

For their part, the Petitioners argue that Congress used the phrase "seeking admission" in § 1225(b)(2)(A) to restrict its scope to applicants who are "apprehended upon inspection at the border" and keep the pre-1996 distinction between arriving and present immigrants. Appellee's Br. 28. Under their own reading, though, the phrase would do no such thing. That reading instead would eviscerate the detention provision by rendering it *narrower* than that pre-1996 version. Consider two hypotheticals. Imagine that an arriving immigrant at the border admits he is "inadmissible" because he was removed in the last five years. 8 U.S.C. § 1182(a)(9)(A)(i). But imagine that this immigrant applies for asylum under § 1158 and seeks humanitarian parole under § 1182(d)(5)(A) while litigating the asylum application. *Cf. Matter of V-X*, 26 I. & N. Dec. 147, 148, 150 (BIA 2013). Neither a grant of parole nor a grant of asylum qualifies as an "admission." *See* 8 U.S.C. § 1101(a)(13)(B); *V-X*, 26 I. & N. Dec. at 150–51; *see also Sanchez v. Mayorkas*, 593 U.S. 409, 415 (2021). This immigrant thus is not seeking "admission" under § 1101(a)(13)(A). Or imagine a more egregious example: an arriving immigrant who gets caught trying to sneak across the border. He was seeking an *unlawful* (not a "lawful") "entry" into the country. 8 U.S.C. § 1101(a)(13)(A). So he too is not "seeking admission." If Petitioners are right, then, both of these arriving immigrants (and perhaps many more) could be released on bond.

For what it is worth, the statutory definition of "admission" has tied the courts and Board of Immigration Appeals in interpretive knots in other contexts. *See generally* Elwin Griffith, *The Meaning of Admission and the Effect of Waivers Under the Immigration and Nationality Act*, 55 Howard L.J. 1 (2011). For example, the Attorney General "may cancel removal of, and adjust to the status of an alien lawfully admitted for permanent residence," some immigrants who illegally entered. 8 U.S.C. § 1229b(b)(1); *see id.* § 1101(a)(20). Yet how could they be "admitted" under § 1101(a)(13) if they *illegally* entered? And another provision makes these residents deportable if they commit an "aggravated felony at any time after admission[.]" *Id.* § 1227(a)(2)(A)(iii). Are immigrants adjusted to lawful permanent residents not deportable under this provision because they *never* had an "admission" under § 1101(a)(13)(A)? The Board has said no,

explaining that "admission" can include an adjustment of status despite the illegal entry. *In re Rosas-Ramirez*, 22 I. & N. Dec. 616, 617–23 (BIA 1999); *see V-X*, 26 I. & N. Dec. at 151–52. And some courts have accepted that "the word 'admission' means different things, depending on the particular part of the INA that is at issue." *Lemus-Losa v. Holder*, 576 F.3d 752, 757 (7th Cir. 2009).

The Petitioners' reading might require the court to go down these "admission" rabbit holes. But my reading would reject the need to confront the meaning of "admission." Whatever it means, § 1225(a)(1) tells us to treat those who are "present" in the country but who have not been "admitted"—as well as those "who arrive[] in the United States"—as "applicants for admission." And under the plain meaning of "applicant," we must treat them as seeking the thing that they are deemed to be applying for. This view of the statutory designation means that my hypothetical arriving immigrants are "seeking admission." It also means that the Petitioners are too.

The Petitioners' own hypothetical shows that they do not have the text on their side. They imagine a statute that defines a "registered voter" as "anyone who is a U.S. citizen, over 18 years of age and who has completed their voter registration form." Appellee's Br. 33–34. Another section of this statute then provides that "in the case of an individual who is a registered voter, if an election inspector determines that an individual seeking to vote does not meet the eligibility requirements, the individual must submit to an inspection." *Id.* at 34. The Petitioners argue that a "registered voter" is not "simultaneously" "seeking to vote." *Id.* But this claim merely proves that "registered" and "seeking" are not the same. That conclusion is irrelevant because § 1225(b)(2) uses the word "applicant," not "registered." And the ongoing *status* of being an applicant implies that the person continues to seek the applied-for item (unless the applicant seeks to withdraw the application). *See Hernandez Alvarez*, 2026 WL 1243395, at *23–24 (Lagoa, J., dissenting).

*Rule Against Superfluity*. The Petitioners next argue that courts must try to avoid rendering statutory text superfluous. Appellee's Br. 31–32; *see Corley v. United States*, 556 U.S. 303, 314 (2009). And they say that my reading of the phrase "seeking admission" makes it duplicative of the phrase "applicant for admission." In their view, Congress could have

accomplished the same goal by omitting the "seeking admission" language altogether: "Subject to subparagraphs (B) and (C), . . . if the examining immigration officer determines that [an applicant for] admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for" removal proceedings.  8 U.S.C. § 1225(b)(2)(A).  I have already responded to this point.  Congress might have used the phrase "seeking admission" to exclude "applicants for admission" who seek to withdraw their applications and depart the country at the time of their inspection.  *See id.* §§ 1225(a)(4), 1229c(a)(1).  On this view, "seeking admission" carries weight apart from "applicant for admission."  I thus "give effect to both" phrases.  *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992).  And the rule against superfluity "does not apply" when both readings leave the words with work to do.  *Id.*

Besides, I am not sure how useful the rule against superfluity is for this complex law. The Supreme Court has lamented that "redundancies are common in statutory drafting" when interpreting the immigration laws.  *Pugin v. Garland*, 599 U.S. 600, 609 (2023) (quoting *Barton v. Barr*, 590 U.S. 222, 239 (2020)).  And IIRIRA's text likewise teems with this "common belt-and-suspenders approach" to draftsmanship.  Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 177 (2012).  As one example, the mandatory-detention provision exempts "stowaways" from its reach.  8 U.S.C. § 1225(b)(2)(B)(iii).  Yet that provision applies only to "applicants for admission[.]"  *Id.* § 1225(b)(2)(A).  And § 1225 elsewhere says that "in no case may a stowaway be considered an applicant for admission[.]"  *Id.* § 1225(a)(2).  To give meaning to the express stowaway exemption, must we search for ways to read the detention provision as treating some stowaways as applicants for admission (no matter how implausible)?  *See Hernandez Alvarez*, 2026 WL 1243395, at *30 (Lagoa, J., dissenting).

As another example, the detention provision applies to an "applicant for admission" who is "seeking admission[.]"  8 U.S.C. § 1225(b)(2)(A).  But this section elsewhere requires immigration officers to inspect those who are "applicants for admission," those who are "seeking admission," those who are seeking "readmission," and those who are seeking "transit through" the country.  *Id.* § 1225(a)(3).  To give "readmission" independent work to do in § 1225(a)(3), must we interpret the mandatory-detention provision to exclude all repeat-offender immigrants who seek to enter a second or subsequent time (that is, those who are seeking *readmission*)?

I would not read the statute in these ways.  For the same reason, even if I were wrong that my view contains no superfluity, I would hesitate to adopt a reading in which an "applicant for admission" would not at least presumptively be "seeking admission."  When the ordinary meaning "contains some redundancy," courts must follow that meaning over an implausible interpretation that eliminates the redundancy.  *Barton*, 590 U.S. at 239 (citation omitted); *see Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385–86 (2013); *Conn. Nat'l Bank*, 503 U.S. at 253–54.

## B. Statutory Structure

The "statutory structure confirms" my view.  *Johnson v. Guzman Chavez*, 594 U.S. 523, 542 (2021).  It shows that Congress would not have drawn the Petitioners' proposed distinction between arriving and present immigrants using the opaque phrase "seeking admission."  The Petitioners' contrary structural argument, by contrast, cannot bear the heavy load they need it to.

### 1. Structural Examples Supporting My View

IIRIRA's design confirms my reading for a general reason and several specific ones.  As a general matter, Congress would have limited § 1225(b)(2)(A) to immigrants "arriving in the United States" if it sought for that paragraph to have that narrow reach.  As a specific matter, Congress repeatedly used the phrase "seeking admission" or "applying for admission" in ways that include those who are present in this country after an illegal entry.

a. *Expressio Unius*. Begin with the general reason.  Courts typically "presume that Congress 'acts intentionally and purposely in the disparate inclusion or exclusion' of phrases across the same legislation."  *Rahman v. Bondi*, 131 F.4th 399, 407 (6th Cir. 2025) (quoting *INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987)); *cf. Romag Fasteners, Inc. v. Fossil, Inc.*, 590 U.S. 212, 214–15 (2020).  So when one provision of the INA gives the Attorney General discretion and a second provision lacks the same "discretionary language," we presume that the second provision does not convey the same discretion as the first.  *See Rahman*, 131 F.4th at 407–08.

This canon applies here. Congress peppered the INA with language distinguishing between *arriving* immigrants and those *present* here. *Compare* 8 U.S.C. §§ 1158(a)(1), 1182(a)(9)(A)(i) ("arriving"), *with id.* §§ 1158(a)(1), 1182(a)(9)(B) ("present"). It repeatedly drew this distinction in the section (§ 1225) that we now must interpret. In subsection (a)(1), Congress identified both categories of immigrants as applicants for admission. *Id.* § 1225(a)(1). Next, subsection (b)'s title—"Inspection of applicants for admission"—shows that it covers both groups of applicants. Subsection (b)(1)'s expedited-removal process then distinguishes between them. One part of subsection (b)(1) allows immigration officers to order the quick removal of those "*arriving* in the United States" from elsewhere. *Id.* § 1225(b)(1)(A)(i) (emphasis added). Another part applies this expedited process to a subset of others who have been "*present* in the United States" for a certain period. *Id.* § 1225(b)(1)(A)(iii)(II) (emphasis added). Section 1225 later contains several other provisions limited to "arriving" immigrants alone. *Id.* § 1225(b)(2)(C), (c)(1), (d)(2).

On the other hand, the detention provision in § 1225(b)(2)(A) is perhaps the only place where Congress did *not* draw this distinction. Unlike many other subsections, this "catchall" contains no text that expressly restricts it to arriving immigrants. *Jennings*, 583 U.S. at 287. And the provision's title—"Inspection of other aliens"—covers all applicants for admission without limit. 8 U.S.C. § 1225(b)(2). This contrast is striking. Congress "elsewhere" limited many parts of § 1225 to arriving immigrants. *Romag*, 590 U.S. at 215. If Congress had drafted the mandatory-detention paragraph in the same way (that is, if it had used "alien arriving in the United States" rather than "alien seeking admission"), the Petitioners' argument would have force. But Congress did not enact this limit. And we must respect Congress's choice.

Indeed, § 1225(b)(2)(A)'s "grammatical structure" makes it odd to find the significant limit on detention that Petitioners propose. *Avila*, 170 F.4th at 1134. On its face, the subparagraph requires an immigration officer to "determine[]" just one thing: "that an alien seeking admission is not clearly and beyond a doubt entitled to" admission. 8 U.S.C. § 1225(b)(2)(A). But the Petitioners would require the officer to determine two things: *both* that an applicant for admission is "seeking admission" (under the Petitioners' narrow view) *and* that the applicant "is not clearly and beyond a doubt entitled to be admitted[.]" *Coronado*, 2025 WL

3628229, at *9.  If Congress had meant to restrict mandatory detention to the narrow range of immigrants who are both on the border and claiming to be admissible, one would have expected to see it in a clear standalone requirement—not a subtle participle clause.  *See Avila*, 170 F.4th at 1134–35.

b. *Inspection Requirement*.  Several other usages of the phrases "seeking" or "applying" for admission further show that "seeking admission" reaches applicants for admission who are present in the country after an unlawful entry.  Start with § 1225(a)(3)'s inspection requirement. It provides: "All aliens (including alien crewmen) who are *applicants for admission* or *otherwise seeking admission* or readmission to or transit through the United States shall be inspected by immigration officers."  8 U.S.C. § 1225(a)(3) (emphases added).  If I substitute the applicable definition of "otherwise" into this paragraph, it requires officers to inspect applicants for admission or those seeking admission "[i]n another way" or "a different manner[.]"  10 *Oxford English Dictionary*, *supra*, 984; *see Webster's Third New Int'l Dictionary* 1598 (1993).  So the paragraph conveys that being an "applicant for admission" is *one* of several ways of "seeking admission."  After all, the specific items that "precede" the phrase "or otherwise" normally represent examples of the general words that follow it.  *Kleber v. CareFusion Corp.*, 914 F.3d 480, 483 (7th Cir. 2019).

The word "otherwise" thus tells us that the group of immigrants seeking admission represents a "different and broader" category that includes (but is not limited to) applicants for admission.  *Fernandez v. Seaboard Marine LTD*, 135 F.4th 939, 954 (11th Cir. 2025).  And under normal interpretive rules, we must interpret the same phrase in the same section in the same way.  *See Monsalvo v. Bondi*, 604 U.S. 712, 726 (2025).  So I would read the phrase "seeking admission" in the detention provision to have the same meaning as the one in the inspection provision.

The Petitioners, my colleagues, and the Second and Eleventh Circuits lack a unified response to this point.  The Petitioners' view of § 1225(a)(3) has changed over time.  Their briefing said that this paragraph "requires the inspection of an 'applicant for admission,' or any other noncitizen, *when they are requesting permission to enter, reenter, or transit through the country*."  Appellee's Br. 35 (emphasis added).  That is, the Petitioners' briefing interpreted the

words that follow "applicants for admission" to restrict the scope of that phrase—such that immigration officers do *not* have a duty to inspect the applicants who are unlawfully present in the country.  That head-scratching view conflicts with the unmistakable command that "[a]ll" "applicants for admission" "shall be inspected by immigration officers."  8 U.S.C. § 1225(a)(3). It also conflicts with the fact that § 1225(b)(1)'s expedited process contemplates the inspection of some applicants who are "present" in this country (not just new arrivals).  *Id.* § 1225(b)(1)(A)(iii)(II).

To their credit, the Petitioners sought to "offer a different reading" of the paragraph at argument.  Oral Arg. 23:35–24:10.  There, they conceded that the paragraph requires immigration officers to inspect all applicants for admission.  But they added that Congress's decision to include *both* "applicants for admission" *and* those "seeking admission" suggests that some applicants must *not* be seeking admission.  If all "applicants for admission" are "seeking admission," they ask, why wouldn't Congress have just listed those "seeking admission" alone? The Petitioners' own argument rebuts this point.  If Congress had written the paragraph in their preferred way (by deleting the words "applicants for admission or otherwise"), it might have left "potential ambiguities" over whether applicants for admission are seeking admission.  *Snyder v. United States*, 603 U.S. 1, 19 (2024).  Congress's "belt and suspenders" approach *clarified* the very uncertainty on which the Petitioners now try to rely to avoid detention.  *Id.*; *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020).  And ironically, the Petitioners' second proposed reading itself violates the rule against superfluity because they give the word "otherwise" no meaning.

My colleagues, by comparison, take yet a third approach to this inspection paragraph. They claim that my reading relies on the *ejusdem generis* canon of construction.  They add that this canon does not apply where, as here, a general phrase follows only one specific example rather than a list of several examples.  *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 224–25 (2008); Scalia & Garner, *supra*, at 206–07.  I agree that this canon does not help the government, but that is because the canon is entirely irrelevant.  The canon counsels us to read a catchall clause that *follows* words like "other" or "otherwise" in a narrow way with an eye toward what it has in common with a preceding list.  *See Fischer v. United States*, 603 U.S. 480, 487–89 (2024).

Yet I am not advocating for a narrow view of "seeking admission." Instead, I am arguing that the word "otherwise" before that phrase shows that being an "applicant for admission" is one way of "seeking admission." And I know of no case that has held that this meaning of "otherwise" can change based on the quantity of items that precede it. *Cf. Fernandez*, 135 F.4th at 954.

In fact, the opinion on which my colleagues rely (*Ali*) proves my point. There, the Supreme Court interpreted the phrase "any officer of customs or excise or any other law enforcement officer" in an exception to a sovereign-immunity waiver. *Ali*, 552 U.S. at 218 (quoting 28 U.S.C. § 2680(c)). The Court refused to give the second group ("any other law enforcement officer") a narrow reading based on the *ejusdem generis* canon because only one item ("officer of customs or excise") preceded this group. *Id.* at 224–25. It then recognized that Congress may have included *both* groups in this list to "remove any doubt" that the specific group (customs or excise officers) fell within the general group (any other law enforcement officers). *Id.* at 226–27. I am making an identical claim: Congress included both specific and general categories here to "remove any doubt" that the specific one (applicants for admission) fell within the general one (seeking admission). *Id.* Plus, if Congress wanted the two categories to operate independently (as my colleagues suggest), why include "otherwise"? Like the Petitioners, they read that word out of the text.

That leaves the fourth approach to this provision from the Second Circuit (and now the Eleventh). Although "otherwise" usually means "in a different way or manner," the Second Circuit suggested that the word can also "refer to something that is different from something already mentioned." *Cunha*, 2026 WL 1146044, at *9 (citation omitted); *see also Hernandez Alvarez*, 2026 WL 1243395, at *12. To prove this point, though, the Second Circuit picked a definition of "or otherwise" from a present-day dictionary. *See Or otherwise*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/or%20otherwise (visited May 2, 2026). And this dictionary lists the following example to explain when this unique definition applies: "Intentionally *or otherwise*, they never told her about the party." *Id.* But that example looks nothing like Congress's use of the word "otherwise" in § 1225(a)(3). In contrast, consider the example that this dictionary provides for the definition that I give the word "otherwise" ("in a

different way or manner"): "glossed over or *otherwise* handled[.]"  *Otherwise*, Merriam-Webster Online, https://www.merriam-webster.com/dictionary/otherwise (visited May 2, 2026).  That example matches the way that Congress used the word in § 1225(a)(3).

Nor do the Second Circuit's two cited cases support its reading.  *See Helsinn Healthcare S.A. v. Teva Pharms. USA, Inc.*, 586 U.S. 123, 131–32 (2019); *Taylor v. United States*, 495 U.S. 575, 597 (1990).  *Helsinn* interpreted a law that barred a party from obtaining a patent on an invention that was "in public use, on sale, or otherwise available to the public before the effective filing date of the claimed invention[.]"  35 U.S.C. § 102(a)(1).  The Court held that a "sale" to a private party could block a patent and refused to interpret that word narrowly to cover only sales that made the invention public.  *Helsinn*, 586 U.S. at 131–32.  Yet the Court reasoned that its prior cases had already interpreted "sale" in this broad way before Congress added the phrase "otherwise available to the public" to the law.  *Id.*  And it refused to read Congress's addition of the "otherwise" clause as narrowing the "well-settled judicial interpretation" of the word "sale."  *Id.* at 132.  I am not sure how this helps the Second Circuit.  My view does not use "otherwise seeking admission" to narrow the phrase "applicant for admission" like the petitioner there sought to do.

The Second Circuit's second case—*Taylor*—confirms my view.  It interpreted the Armed Career Criminal Act, which increases the punishment if a defendant has previously committed "violent felon[ies]."  18 U.S.C. § 924(e)(1).  The Act defines violent felony to cover any offense that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."  *Id.* § 924(e)(2)(B)(ii).  *Taylor* refused to read the "otherwise" clause as limiting the covered burglary offenses to those dangerous burglaries "whose elements include 'conduct that presents a serious risk of physical injury to another,' over and above the risk inherent in ordinary burglaries."  495 U.S. at 597.  *Taylor* supports my reading because it recognized that Congress may have specifically included burglaries to make clear that they are the types of offenses that "present[] a risk of injury to persons[.]"  *Id.*  Like *Ali*, then, *Taylor* supports my logic: Congress included "applicants for admission" in the inspection provision to clarify that these groups of immigrants should be viewed as "seeking admission."

All told, the Petitioners, my colleagues, and the Second and Eleventh Circuits come up with four different explanations to reconcile their view of the phrase "seeking admission" with the use of the word "otherwise" in § 1225(a)(3).  But none of these four theories works.  And if anything, this struggle to come up with a workable theory shows how much they must depart from the plain meaning to reach their result.

c. *Statement Requirement*.  During the inspection, § 1225(a) also requires "applicants for admission" to disclose to immigration officers why they are "seeking admission": "An *applicant for admission* may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the *applicant* in *seeking admission* to the United States, including the applicant's intended length of stay and whether the applicant intends to remain permanently or become a United States citizen, and whether the applicant is inadmissible."  8 U.S.C. § 1225(a)(5) (emphases added).  This provision implies that an "applicant for admission" is "seeking admission" by connecting the two phrases.  It thus demonstrates again that "applicants for admission" are presumptively "seeking admission."

The Second Circuit responded that the verb "may" in the provision "implicitly" shows that it does not apply to *all* applicants.  *See Cunha*, 2026 WL 1146044, at *11.  That theory conflicts with normal grammar rules.  Yes, the verb "may" indicates that the provision gives discretion to immigration officers about whether to require an under-oath statement and does not impose a "command" on those officers.  *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016).  But no, that verb does not reduce the number of applicants who may have to give a statement.  An immigration officer has discretion to ask *any* applicant for the statement. No better is the Second Circuit's reliance on the absurdity canon.  That court thought it "absurd" to ask immigrants (like the Petitioners) who have been here for many years how long they plan to stay.  *Cunha*, 2026 WL 1146044, at *11.  During the inspection, though, officers might know little about an immigrant's background.  So I do not find this questioning absurd.  *See Hernandez Alvarez*, 2026 WL 1243395, at *30 (Lagoa, J., dissenting).  And the court's "invocation of the 'absurd result' canon" risks "substituti[ng] [its own] pleasure to that of the legislative body." *Public Citizen v. Department of Justice*, 491 U.S. 440, 470–71 (1989) (Kennedy, J., concurring in judgment) (quoting The Federalist No. 78, p.469 (C. Rossiter ed. 1961) (A. Hamilton)).

d. *Parole Relief.*  Next consider the parole provision.  It gives the Secretary of Homeland Security discretion to "parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any *alien applying for admission* to the United States[.]"  8 U.S.C. § 1182(d)(5)(A) (emphasis added); *see* 8 C.F.R. § 212.5.  Yet this provision notes that parole does not count "as an admission[.]"  8 U.S.C. § 1182(d)(5)(A).  It further notes that a paroled immigrant "shall forthwith return or be returned to the custody from which he was paroled" when the reason for the parole ends.  *Id.*  At that point, the case shall "continue to be dealt with in the same manner as that of any other *applicant for admission* to the United States."  *Id.* (emphasis added).

This provision raises a similar interpretive question: can an "applicant for admission" who is present in this country after an unlawful entry qualify as an "alien *applying* for admission" who may seek parole?  *Id.* (emphasis added).  This question, though, flips the equities because a "yes" answer would help this group.  And the circuit courts that have confronted the question have answered in the affirmative.  *See Cruz-Miguel*, 650 F.3d at 197–98; *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1116 (9th Cir. 2007).  The government has also taken this position in the past.  *See* I.N.S. Gen. Couns. Mem. 98-10, 1998 WL 1806685, at *2 (Aug. 21, 1998).  As the Second Circuit suggested, the parole provision's "language itself is not . . . limited" to "arriving aliens" and can cover "even aliens already physically present" because § 1225(a)(1) tells us to regard them as "applicants for admission."  *Cruz-Miguel*, 650 F.3d at 197–98 (citation omitted).  This reading makes sense of the whole text.  The text conveys that an "alien applying for admission" is an "applicant for admission" because it instructs that this alien should be treated like "any *other* applicant for admission" when returned from parole. 8 U.S.C. § 1182(d)(5)(A) (emphasis added).

It would be incongruous to hold that an immigrant present in this country after an unlawful entry can qualify as an "alien applying for admission" under the parole provision (§ 1182(d)(5)(A)) but not an "alien seeking admission" under the detention provision (§ 1225(b)(2)(A)).  *See Hernandez Alvarez*, 2026 WL 1243395, at *27 (Lagoa, J., dissenting). True, the one paragraph uses the verb "applying" while the other uses the verb "seeking."  But those verbs are synonymous (and, if anything, "seeking" is the broader of the two that

encompasses more).   So if § 1225(a)(1)'s statutory designation deeming these immigrants "applicant[s] for admission" renders them eligible for parole, it should render them subject to detention.   Alternatively, if that designation does not make them subject to detention, it should disqualify them from parole.   Either way, we must construe these two provisions as a "harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (citation omitted).   And because I agree with those circuits that have allowed present immigrants to seek parole, I must find them subject to detention.

Notably, the Second Circuit ignored the parole provision when it concluded that applicants for admission are not "applying for admission" or "seeking admission" under the INA. *See Cunha*, 2026 WL 1146044, at *9–13.   So its caselaw (considered collectively) concludes that these applicants can qualify as immigrants "applying for admission" who may seek parole, *Cruz-Miguel*, 650 F.3d at 197–98 (citation omitted), but not immigrants "seeking admission" who must be detained, *Cunha*, 2026 WL 1146044, at *4–9.   This disharmonious approach is untenable.

e. *Lawful Permanent Residents*.   The definition of "admission" next includes an exception for immigrants who are lawfully admitted for permanent residence and who seek to re-enter after a trip abroad.   This exception provides: "An alien lawfully admitted for permanent residence in the United States shall not be regarded *as seeking an admission* into the United States for purposes of the immigration laws unless the alien" falls within one of several carveouts.   8 U.S.C. § 1101(a)(13)(C) (emphasis added).   One carveout treats this lawful permanent resident "as seeking an admission" if the resident "is attempting to enter at a time or place other than as designated by immigration officers or *has not been admitted to the United States after inspection and authorization by an immigration officer*." *Id.* § 1101(a)(13)(C)(vi) (emphasis added).   Put another way, a lawful permanent resident who, on a return to this country, sneaks in without inspection is treated as "seeking admission" even though this resident (like the Petitioners) is already present. *Cf.* H.R. Rep. No. 104-469, pt. 1, at 225–26 (1996).   So this provision confirms that the law sometimes treats present immigrants as "seeking admission" even after an illegal entry.

f. *Aliens Unlawfully Present*.  The same is true of some of Congress's many categories of "inadmissible aliens."  One category renders "inadmissible" "[a]ny alien . . . who" "has been unlawfully present in the United States for one year or more, and who *again* seeks admission within 10 years of the date of such alien's departure or removal from the United States[.]" 8 U.S.C. § 1182(a)(9)(B)(i)(II) (emphasis added).  As the Board of Immigration Appeals has explained, the word "again" in this provision would serve no purpose unless the prior unlawful presence itself qualified as the *first* time that the immigrant was "seeking admission."  *Lemus-Losa*, 25 I. & N. Dec. 743 n.6.  And that is true only under my view: immigrants who are present here after an unlawful entry are "seeking admission" due to their designation as "applicants for admission."  *Id.*

The Second Circuit, by contrast, would limit the three provisions in § 1182(a)(9) that use the phrase "again seeks admission" to cover only those who had "previously sought lawful entry" and now seek it a second time.  *Cunha*, 2026 WL 1146044, at *12.  The text cannot support that reading.  The provision applies to "*[a]ny* alien (other than an alien lawfully admitted for permanent residence) who" "has been *unlawfully present* in the United States for one year or more" and "again seeks admission within 10 years[.]"  8 U.S.C. § 1182(a)(9)(B)(i)(II) (emphases added).  Because the provision applies to "any" "unlawfully present" "alien," I would find it strange to read the word "again" to limit it to the subset of unlawfully present immigrants who previously sought a lawful entry (but then, say, overstayed their visas).  The word "again" is more naturally read (like the Board has read it) to suggest that an immigrant's unlawful presence qualifies as "seeking admission" due to the designation treating the immigrant as an "applicant for admission."

To sum up: In nearly every other context, when Congress sought to limit a provision's reach to those arriving at the border, it used a phrase like "arriving in the United States."  And in nearly every other context, when Congress used phrases like "seeking admission" or "applying for admission," it covered all "applicants for admission," including those present in the country after an illegal entry.  So it would be obvious that we must read the phrase "seeking admission" in the detention provision in the same way—but for the harsh policy consequences.  *See Monsalvo*, 604 U.S. at 726.  Because that policy concern should not affect the judiciary's neutral

interpretation under fundamental separation-of-powers principles, I would follow the law where it leads.

## 2. The Petitioners' Contrary Structural Example

Against all this evidence that "applicants for admission" are "seeking admission," the Petitioners offer one counterexample again tied to the rule against superfluity. Recall that § 1226 retained the Attorney General's pre-1996 discretion to release immigrants on bond or conditional parole. *See* 8 U.S.C. § 1226(a)(2). The Petitioners do not argue that my view of § 1225(b)(2)(A)'s mandatory-detention language renders this release power meaningless because it would still apply to many immigrants not subject to mandatory detention. Most obviously, it would cover the many admitted immigrants who engage in conduct that renders them deportable. *See id.* § 1227(a).

The Petitioners instead invoke § 1226(c), which creates an exception to § 1226(a)'s release authority for "criminal aliens." *Id.* § 1226(c). This subsection historically required the Attorney General to "take into custody" immigrants who are inadmissible or deportable because they committed various crimes or terrorist acts. *Id.* § 1226(c)(1)(A)–(D). The recent Laken Riley Act now adds to § 1226(c)'s detention list immigrants who are inadmissible because they are present without being admitted or paroled if they are "charged with," "arrested for," "convicted of," or confess to various crimes. *Id.* § 1226(c)(1)(E); *see id.* § 1182(a)(6)(A). The Petitioners argue that we would nullify § 1226(c)'s distinct detention requirement if we read § 1225(b)(2)(A)'s detention requirement to cover all immigrants present here after an unlawful entry. Appellee's Br. 23–26.

Before the Laken Riley Act, this argument had little force. To start, the subparagraphs in § 1226(c) covering "deportable" immigrants would never apply to unadmitted immigrants like the Petitioners. 8 U.S.C. § 1226(c)(1)(B)–(D). Next, even the subparagraphs in § 1226(c) that cover immigrants who are "inadmissible" for committing certain crimes or terrorist acts would apply to those who engaged in these offenses while granted parole under § 1182(d)(5)(A). As a result, § 1226(c) would compel the government to detain many immigrants not subject to detention under § 1225(b)(2)(A) even under my broader view of the latter provision. Because

the two provisions are "not superfluous" under any interpretation, I am at a loss to see how this part of § 1226(c) matters to our interpretation of § 1225(b)(2)(A).  *Nielsen v. Preap*, 586 U.S. 392, 415 (2019).

Still, the Laken Riley Act perhaps provides the Petitioners' best competing example: Why would Congress have required the Attorney General to arrest certain *criminal* immigrants present here who have not been admitted or paroled if the government must detain *all* those immigrants anyway?  I see at least three answers.  Start with what the Supreme Court has called the "short answer" when rejecting an identical argument using later statutory amendments to interpret earlier text.  *O'Gilvie v. United States*, 519 U.S. 79, 89 (1996).  We must place the Laken Riley Act in context.  In 2025, DHS had long followed a "practice" of giving "bond hearings" to immigrants present in this country who had entered unlawfully, including those charged with "serious crimes" by state or federal authorities.  *Coronado*, 2025 WL 3628229, at *11.  As far as I am aware, no circuit court (perhaps no court) had opined on the propriety of this practice.  So what the Supreme Court said in that similar case applies here: "Congress might simply have thought that the then-current law about" who must be detained "was unclear[.]" *O'Gilvie*, 519 U.S. at 89.  And it might have only "wanted to clarify" that the Attorney General must take certain criminals into custody, while "leav[ing] the law where it found it" for all others.  *Id.*; *see Tex. Dep't of Housing and Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 566–75 (2015) (Alito, J., dissenting).

In all events, the mandatory-detention provision has a different scope than the Laken Riley Act in at least two ways.  Before any detention, the Laken Riley Act imposes heavier burdens on the Executive Branch.  *See Coronado*, 2025 WL 3628229, at *11. Section 1225(b)(2)(A)'s detention requirement kicks in only *after* an immigration officer inspects an immigrant and launches removal proceedings.  8 U.S.C. § 1225(b)(2)(A).  And while this section also says that all applicants for admission "*shall* be inspected," it says nothing about how the Executive Branch should *search* for them.  *Id.* § 1225(a)(3) (emphasis added). Conversely, the Laken Riley Act requires the Attorney General to "*take into custody*" covered criminal immigrants when they are "released" from federal or state detention.  *Id.* § 1226(c)(1) (emphasis added).  Unlike § 1225, then, § 1226(c) imposes a duty to *search* for these criminal

immigrants. And this duty matches a similar one: the duty to "expeditiously" start removal proceedings against them. *Id.* § 1229(d)(1).

After any detention, the mandatory-detention provision allows the Executive Branch to parole aliens subject to § 1225(b)(2)(A) for "urgent humanitarian reasons or significant public benefit[.]" *Id.* § 1182(d)(5)(A). But the Laken Riley Act has a narrower exception. The government may release immigrants who fall within the Act only if their release is "necessary to provide protection to a witness" (or related individuals), if they do not "pose a danger," and if they will likely appear at a removal proceeding. *Id.* § 1226(c)(4). In sum, the INA prioritizes the arrest, detention, and removal of criminal immigrants under any interpretation of § 1225(b)(2)(A). So the Laken Riley Act also is "not superfluous" under my reading. *Nielsen*, 586 U.S. at 415. Although the two provisions may "overlap," they are not "congruent." *Jennings*, 583 U.S. at 305. The Act thus should not lead us to depart from § 1225(b)(2)(A)'s plain meaning.

## C. Statutory History

The INA's statutory history—the changes that Congress has made to the codified text over time—provides yet one more data point confirming my view. *See Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 232–33 (2020). This "statutory history" (unlike legislative history) "form[s] part of the context of the statute" as it exists today. Scalia & Garner, *supra*, at 256.

The specific changes that IIRIRA made to the mandatory-detention provision refute the Petitioners' claim that the current version applies only to immigrants at the border. Before 1996, this provision unambiguously applied only to arriving immigrants. It said: "Every alien (other than an alien crewman) . . . who may not appear to the examining immigration officer *at the port of arrival* to be clearly and beyond a doubt entitled *to land* shall be detained for further inquiry to be conducted by a special inquiry officer." 8 U.S.C. § 1225(b) (1994) (emphases added). And when Congress amended this text just before it passed IIRIRA, it continued to cover only arriving immigrants seeking "entry": "if the examining immigration officer determines that an alien seeking *entry* is not clearly and beyond a doubt entitled to *enter*, the alien shall be detained for a hearing before a special inquiry officer." AEDPA, § 422(a), 110 Stat. at 1271 (emphases

added).   The word "entry" was generally defined to mean "any coming of an alien into the United States, from a foreign port or place or from an outlying possession[.]"   8 U.S.C. § 1101(a)(13) (1994).

If Congress had meant to keep the detention provision limited to arriving immigrants, it could have used any of these formulations.  The new statute might have read: "[I]n the case of an alien who is an applicant for admission, if the examining immigration officer [at the port of arrival] determines that an alien . . . is not clearly and beyond a doubt entitled to [land], the alien shall be detained for" removal proceedings.  8 U.S.C. § 1225(b)(2)(A).  Or it might have read: "[I]n the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking [entry] is not clearly and beyond a doubt entitled to [enter], the alien shall be detained for" removal proceedings.  *Id.*  But Congress did not write these laws.  And the Petitioners cannot explain why Congress would abandon words like "port of arrival," "land," or "entry" if it meant to keep the provision limited to arriving immigrants.  So only my view "gives the new language . . . 'real and substantial effect.'"  *Husted v. A. Philip Randolph Inst.*, 584 U.S. 756, 772 (2018) (citation omitted); *Hernandez Alvarez*, 2026 WL 1243395, at *34 (Lagoa, J., dissenting).

A big-picture point confirms the same.  Before IIRIRA, the Supreme Court had read the INA to treat immigrants who attempted to lawfully enter more harshly than immigrants who unlawfully evaded inspection.  *Hing Sum*, 602 F.3d at 1100.  But IIRIRA eliminated this distinction by treating both groups as "applicants for admission" and by rendering those who are present after an illegal entry as "inadmissible" rather than "deportable."  8 U.S.C. §§ 1182(a)(6)(A)(i), 1225(a)(1).  My interpretation respects this change because now *all* these immigrants (those who get inspected at the border and those who get inspected later) must remain in custody during their removal proceedings.  The Petitioners' view, by contrast, would make the inequitable distinction worse.  Before 1996, an "entry" included any *lawful or unlawful* "coming of an alien into" the country.  8 U.S.C. § 1101(a)(13) (1994).  So the phrase "alien seeking entry" in the detention statute would include immigrants apprehended as they tried to illegally enter.  Yet the Petitioners' strict reading of "alien seeking admission" (to cover only those who request a "lawful entry," 8 U.S.C. § 1101(a)(13)(A)) reads the mandatory-detention

provision to exclude these immigrants who seek to illegally enter. The Petitioners' view thus would read IIRIRA to expand (rather than eliminate) the "perverse incentive to enter at an unlawful rather than a lawful location" that existed before Congress passed that law. *Thuraissigiam*, 591 U.S. at 140.

For their part, the Petitioners invoke a competing piece of statutory history. The prior version of § 1226(a) gave the Attorney General discretion to release only immigrants awaiting "a determination of *deportability*," not those at the border subject to exclusion proceedings. 8 U.S.C. § 1252(a)(1) (1994) (emphasis added). The current § 1226(a), by comparison, allows the Attorney General to release on bond an "alien" "pending a decision on whether the alien is to be *removed*[.]" 8 U.S.C. § 1226(a) (emphasis added). Unlike the prior version, then, the current one uses the generic term "removed." So it facially covers not just "deportable aliens" under § 1227 but also "inadmissible" ones under § 1182. I find this fact unsurprising because § 1225(b)(2)(A)'s mandatory-detention requirement does not cover all inadmissible immigrants. "[T]hink of someone who entered the country unlawfully, but then received asylum." *Sanchez*, 593 U.S. at 415. What happens if the government later wants to remove this person? Section 1226(a) likely would apply. But it might not if Congress had limited it to "deportable aliens" under § 1227. This statutory change thus makes just as much sense under my reading as it does under Petitioners'.

The Petitioners next turn to a mix of legislative history and uncodified text. When Congress enacted IIRIRA, some representatives opined that § 1226(c) would require the detention of 45,000 criminal immigrants. Appellee's Br. 36–37 (citing H.R. Rep. No. 104-469, pt. 1, at 118, 120, 123 (1996)). So IIRIRA allowed the Attorney General to delay § 1226(c)'s requirement to take these immigrants into custody by certifying that the government had "insufficient detention space" and personnel to carry out this requirement. IIRIRA § 303(b), 110 Stat. 3009-586. But IIRIRA did not include a similar postponement option for detention under § 1225(b)(2)(A). Yet some representatives thought there were many more immigrants in the country after an illegal entry (some 2 million) than there were criminal immigrants. Appellee's Br. 37 n.16 (citing H.R. Rep. No. 104-469, pt. 1, at 111). The Petitioners (and my colleagues) find it "implausible" that Congress would have expressed concern about increased detention

under § 1226(c) while remaining silent about the strain that my view of § 1225(b)(2)(A) would impose. *Id.* at 37.

Yet I could engage in the same type of "speculation as to Congress's intent" to support my view. *Magwood v. Patterson*, 561 U.S. 320, 334 (2010). Recall that § 1226(c) imposes an affirmative duty on the Attorney General to arrest criminal immigrants. 8 U.S.C. § 1226(c)(1), (4). So perhaps Congress read § 1225(b)(2)(A) to grant more "enforcement discretion over arrests" than § 1226(c). *United States v. Texas*, 599 U.S. 670, 679 (2023). Or perhaps Congress thought the "parole option" under § 1182(d)(5)(A) would relieve any detention-capacity concerns with § 1225(b)(2)(A). *Biden v. Texas*, 597 U.S. 785, 814–15 (2022) (Kavanaugh, J., concurring). In that respect, Congress adopted a broader parole provision, *see* 8 U.S.C. § 1182(d)(5)(A), than the narrow version in the House Report on which the Petitioners rely, *see* H.R. Rep. No. 104-469, pt. 1, at 77–78, 140–41, 258. And if we are going to rely on legislative history, we should at least acknowledge the parts that show an intent to jettison the prior framework in which immigrants who entered "without inspection gain[ed] equities and privileges . . . that [were] not available to" those who lawfully presented themselves. *Id.* at 225. At day's end, I would disregard all this speculation. We must apply the enacted text as written, not the unenacted intent of a subset of legislators. *See Oklahoma v. Castro-Huerta*, 597 U.S. 629, 642 (2022). And the statutory text, structure, and history all prove that the Petitioners are "applicant[s] for admission" who are "seeking admission" into the country. 8 U.S.C. § 1225(b)(2)(A). That conclusion ends the matter.

### D. Precedent, Practice, and Avoidance

The Petitioners end with claims tied to unrelated precedent, past practice, and constitutional avoidance. These final arguments cannot justify a departure from the statute's plain meaning.

1. *Precedent*. The Petitioners first argue that the Supreme Court's *Jennings* decision supports them. Appellee's Br. 10. They emphasize language in *Jennings* stating that § "1226 generally governs the process of arresting and detaining [the] group of aliens" who are "inside the United States" but "do not have an absolute right to remain here." 583 U.S. at 288. But this

sentence does not undercut my reading. Of most note, *Jennings* concerned a different issue. The Court asked whether the INA required the government to give immigrants bond hearings once it had detained them pending their removal proceedings for six months. *Id.* at 285–86. It answered no. In the process, it did not purport to rule on the meaning of § 1225(b)(2)(A), let alone decide that the government must detain immigrants present in this country after an illegal entry only under § 1226(a). And the Court has repeatedly told us not to parse every sentence in its opinions as if they were statutes. *See Borden v. United States*, 593 U.S. 420, 443 n.9 (2021) (plurality opinion); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). Just a month ago, it cautioned that we should not read "general language" in its decisions as "referring to quite different circumstances that the Court was not then considering." *Olivier v. City of Brandon*, 146 S. Ct. 916, 925 (2026) (citation omitted). Because *Jennings* did not consider the scope of § 1225(b)(2)(A), I would not overread any language about the specific contours of the respective sections.

Besides, if we must guess how the Supreme Court will rule based on snippets in its opinions, I would look to different language in *Jennings*. The decision framed § 1225(b)(2)(A) as a "catchall provision that applies to *all* applicants for admission not covered by § 1225(b)(1)[.]" *Jennings*, 583 U.S. at 287 (emphasis added). No one contends that the Petitioners are subject to § 1225(b)(1). And everyone agrees they are "applicants for admission." So they must fit into the "catchall"—§ 1225(b)(2)—that *Jennings* said applies to all applicants for admission. In short, any effort to read *Jennings* out of context poses just as much a problem for the Petitioners. *See Hernandez Alvarez*, 2026 WL 1243395, at *33–34 (Lagoa, J., dissenting).

2. *Practice*. The Petitioners also turn to the government's traditional view. They correctly note that the government's new interpretation contravenes "three decades of unbroken practice" to give bond hearings to those like Petitioners who are in this country after an illegal entry. Appellee's Br. 17. And the government's longstanding interpretation of a law may help clarify ambiguous text. *See Edwards' Lessee v. Darby*, 25 U.S. 206, 210 (1827); *see generally* Aditya Bamzai, *The Origins of Judicial Deference to Executive Interpretation*, 126 Yale L.J. 908 (2017). "But a 'long-established practice' does not justify a rule that denies statutory text its

fairest reading." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 329 (2015). For example, the Court did not hesitate to reject what had been the decades-old agency and judicial view of Title VII when it held that the text unambiguously covered sexual-orientation discrimination. *See Bostock v. Clayton County*, 590 U.S. 644, 649–53 (2020); *cf. id.* at 722–24 (Alito, J., dissenting). Likewise, the Court held that it must follow IIRIRA's text even when it conflicted with agency practice dating to 1997. *See Pereira v. Sessions*, 585 U.S. 198, 204–05, 208–09 (2018). So the Executive Branch's prior view should not stop us from giving the statute its proper scope now.

Indeed, the respect that we should give an agency's reading depends in part on how seriously it grappled with the question. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). But the Petitioners identify no reasoned opinion from the Executive Branch that supports their view. To the contrary, the government adopted that view in one conclusory sentence soon after IIRIRA's enactment: "Despite being applicants for admission, aliens who are present without having been admitted or paroled (formerly referred to as aliens who entered without inspection) will be eligible for bond and bond redetermination." 62 Fed. Reg. at 10323. To make matters worse, this conclusion appears to conflict with its separate view that the same group of immigrants may seek parole under § 1182(d)(5)(A). *See* Mem. 98-10, 1998 WL 1806685, at *2. I thus would give the agency's unreasoned and contradictory prior positions no weight. *See Nassar*, 570 U.S. at 361; *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155 (2012).

3. *Avoidance.* As a last resort, the Petitioners ask us to invoke the canon of constitutional avoidance. Appellee's Br. 41. They argue that a statutory mandate to detain them without bond hearings during their removal proceedings would "raise serious due process concerns." *Id.* at 42. So they say that we should avoid this reading of § 1225(b)(2)(A). They are wrong for two reasons. First, like similar canons, we may invoke the canon of constitutional avoidance only to *resolve* ambiguity in statutory text, not to *create* it. *See Jennings*, 583 U.S. at 296. But the Petitioners do not identify a "plausible" reading of § 1225(b)(2)(A). *Id.* That provision instead has one clear meaning. The canon thus does not apply. *See Thuraissigiam*, 591 U.S. at 133. Second, and regardless, courts will rely on this canon only when one interpretation "raises

serious constitutional doubts." *Jennings*, 583 U.S. at 286. As discussed below, my reading does no such thing.

### III. Constitutional Question: Does Due Process Bar the Petitioners' Detention?

The Petitioners fall back on the claim that the Due Process Clause bars the government from detaining all immigrants who are present in this country after an illegal entry without granting them individualized bond hearings. Appellee's Br. 47–49. Given the Supreme Court's existing due-process precedent on this topic, I need not spend much time on this backup argument.

Under the Fifth Amendment, "[n]o person" may "be deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V. The Supreme Court's cases leave no doubt that this protection extends to immigrants in the "context of removal proceedings." *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025) (per curiam) (citation omitted). But its cases also leave no doubt that the protection applies in a narrow way in that context. *See Thuraissigiam*, 591 U.S. at 139–40; *Demore v. Kim*, 538 U.S. 510, 521–23 (2003); *Reno v. Flores*, 507 U.S. 292, 305–06 (1993).

Non-citizen immigrants do not have a due-process "liberty" interest (or private right) to *enter* the United States or continue to *reside* in the country after entering it. *See* Caleb Nelson, *Adjudication in the Political Branches*, 107 Colum. L. Rev. 559, 580–81 & nn.82–83 (2007) (citing *Nishimura Ekiu v. United States*, 142 U.S. 651, 659–60 (1892); *Fong Yue Ting v. United States*, 149 U.S. 698, 707 (1893)). So "executive officers"—rather than Article III judges—may oversee the hearing to decide whether to remove them and find any necessary facts. *Carlson v. Landon*, 342 U.S. 524, 537 (1952); *see United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950). In contrast, U.S. citizens that the government mistakes for immigrants may well have a right to judicial (not administrative) process if the government tried to remove them. *See* Nelson, *supra*, at 581; *cf. SEC v. Jarkesy*, 603 U.S. 109, 147–51 (2024) (Gorsuch, J., concurring).

That said, immigrants have some due-process protections associated with these Executive Branch hearings. The kinds of rights that immigrants retain turns on whether they remain at the

border or have entered the country. *See Zadvydas v. Davis*, 533 U.S. 678, 682 (2001). The Court has long read the Due Process Clause to give arriving immigrants at the border "only those rights" that Congress has seen fit to grant them as a statutory matter. *Thuraissigiam*, 591 U.S. at 140; *see Nishimura Ekiu*, 142 U.S. at 660. It has, by comparison, suggested that immigrants in the country might have some basic due-process rights apart from any statute, including the right to receive "notice and [an] opportunity to be heard" about their removability. *J.G.G.*, 604 U.S. at 673.

"Detention" has always been a valid "part of" the removal "procedure" for both sets of immigrants. *Carlson*, 342 U.S. at 538; *see Reno*, 507 U.S. at 306; *Wong Wing v. United States*, 163 U.S. 228, 235 (1896). If immigrants have not entered the country, Congress's laws provide the sole source of protection from detention. *See Thuraissigiam*, 591 U.S. at 140. The Court thus has held that due process permits the government to detain an arriving immigrant *indefinitely* (even after the completion of his exclusion proceedings) when no other country would take him. *See Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 207, 212–16 (1953).

The Court has suggested a different dichotomy for immigrants present in the country. It has opined that a statute permitting this type of *indefinite post-proceeding detention* "would raise a serious" due-process "problem." *Zadvydas*, 533 U.S. at 690–96. At the same time, the Court has repeatedly held that the Due Process Clause allows the government to detain these immigrants "*pending their removal proceedings*." *Demore*, 538 U.S. at 527–28. The Court, for example, concluded that due process did not require individual bond hearings for criminal immigrants whom the government must detain under § 1226(c) during their removal proceedings. *See id.* at 523–31. It likewise held that due process did not require individual "best interest" hearings for detained juvenile immigrants to determine whether the government should place them in a private setting during their removal proceedings. *See Reno*, 507 U.S. at 302–06. And it has held that due process did not require individual dangerousness or flight-risk findings to detain communist immigrants during their removal proceedings. *Carlson*, 342 U.S. at 537–42; *see Demore*, 538 U.S. at 523–25. Indeed, the Supreme Court suggested that, before 1907, "there was no provision permitting bail for *any* aliens during the pendency of their deportation

proceedings." *Demore*, 538 U.S. at 523 n.7. But I am aware of no Supreme Court case that raised due-process concerns with this detention. The Court instead recognized that the government acts in a "valid" way when it requires the "temporary confinement" of immigrants "as part of the means necessary to give effect to the provisions for [their] exclusion or expulsion[.]" *Wong Wing*, 163 U.S. at 235; *see also Martinez v. Larose*, 968 F.3d 555, 565–66 (6th Cir. 2020).

These principles doom the Petitioners' due-process claim. To be sure, they have been present in this country for an extended period, so due process may limit their "potentially *indefinite*" detention after the *completion* of their removal proceedings. *Zadvydas*, 533 U.S. at 691. But the detention provision calls for their detention only *pending* those proceedings. *See* 8 U.S.C. § 1225(b)(2)(A). And the Petitioners raise a "facial challenge" to this detention, claiming that the Due Process Clause requires individualized bond hearings regardless of whether their removal proceedings last only a few weeks or drag on for years. *Reno*, 507 U.S. at 300. Not only that, the INA allows the Petitioners to seek parole if they can show that "urgent humanitarian reasons or significant public benefit" justifies their release. 8 U.S.C. § 1182(d)(5)(A). Some of the considerations on which they rely for their due-process argument (such as their length of stay in the country and their lack of criminal records) might matter under this parole inquiry. And all of them concede that they are inadmissible because they unlawfully entered the country. In these circumstances, the Petitioners' temporary detention during their "removal proceedings" represents a "constitutionally permissible part of that process." *Demore*, 538 U.S. at 531.

In response, the Petitioners claim to raise both substantive and procedural due-process claims. Appellee's Br. 47. But their substantive due-process claim fails once we articulate a "careful description" of their proposed right. *Reno*, 507 U.S. at 302. They assert a right to remain at large in this country during their removal proceedings if an adjudicator would find that they do not represent an *individualized* flight risk or danger. For decades, however, the Supreme Court has held that immigrants do not have any right—let alone a fundamental right—to be present in the country. *See Fong Yue Ting*, 149 U.S. at 707. And detention during removal proceedings satisfies the deferential rational-basis test that applies as a result. *See Reno*, 507

U.S. at 303.  It *categorically* "serves the purpose of preventing [removable immigrants] from fleeing prior to or during their removal proceedings, thus increasing the chance that" *all* "will be successfully removed."  *Demore*, 538 U.S. at 528.  And Congress may make these types of overinclusive "categorical judgments" under rational-basis review.  *Vidal v. Elster*, 602 U.S. 286, 319 (2024) (Barrett, J., concurring in the judgment).  The Petitioners also do not dispute that the government may detain *arriving* immigrants who present themselves for inspection at the border.  So the government has a rational basis in detaining those who evade inspection to eliminate the "perverse incentive" that the law would otherwise create.  *Thuraissigiam*, 591 U.S. at 140.

As for their procedural claim, the Petitioners argue that the balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976), shows that they have a right to a bond hearing at which they can prove they do not represent an individualized flight risk or public danger.  But the statute requires their detention *whether or not* an adjudicator would make these individualized findings.  And they do not have a procedural right to prove facts at a hearing that the law renders *irrelevant* to their detention.  *See Conn. Dep't of Pub. Safety v. Doe*, 538 U.S. 1, 7–8 (2003).  In truth, "[t]his is just [their] 'substantive due process' argument recast in 'procedural due process' terms, and" I would "reject it for the same reasons."  *Reno*, 507 U.S. at 308.

\* \* \*

In sum, the INA requires the government to detain the Petitioners during their removal proceedings.  And the Due Process Clause permits this detention.  The Petitioners thus have failed to show that they are "in custody in violation of the Constitution or laws . . . of the United States[.]"  28 U.S.C. § 2241(c)(3).  So I would deny their habeas petitions.  I respectfully dissent.